OSCAR BEACH AND MARGARET BEACH, Appellants, v. MARGARET C. BRYAN, Respondent.

St. Louis Court of Appeals. Argued and Submitted December 8, 1910. Opinion Filed January 14, 1911.

1. EQUITY: Deals with Property Rights Only. Courts of equity deal with property rights alone, are concerned only with questions affecting property, and exercise no jurisdiction in matters of wrong to the person.

2. ADOPTION: Contract for: Money Expended by Adoptive Parents: Right of Recovery. Money expended by one in caring for a minor child, in reliance upon its surviving parent's oral

155 App.—3

agreement to permit him to adopt the child, may be recovered back in an action at law against such parent, upon her subsequent refusal to perform her agreement; and possibly damages might be recovered for loss of the child's services.

3. EQUITY: Specific Performance: Personal Services. Equity will not decree specific performance of a contract for personal services.

4. APPRENTICES: Necessity of Deed: Deed of Indenture. At common law, as well as by section 1686, Revised Statutes 1909, a legal apprenticeship can be created only by deed, and at common law, and also under the statute, with some exceptions, it can be effected only by a deed of indenture.

5. ADOPTION: Regulated by Statute. The adoption of children is regulated by statute, being unknown to the common law; and such statute must be strictly complied with.

6. ———: ———: Purposes. The matter of adoption in this state has a two-fold aspect—first, the taking over of the child by those who propose to adopt it; second, the relinquishment of the parental right to the child by its parent, guardian or other authority charged with its custody, both of these matters being regulated by statute. (Sections 1671, 1672, 1673, 1675, 1677 and 1678, Revised Statutes 1909).

7. ———: Consent of Parent not Necessary, When. Sections 5246, 5247 and 5248, Revised Statutes 1899, providing for the adoption of children, relate solely to the act of the adopter, and do not require the assent of the parent, the child, or any one else.

8. ———: Child Intrusted to Custody of Institution: Parent's Consent to Adoption Necessary. Under section 5250, Revised Statutes 1899, where a child under seven years of age, which has a surviving parent, has been intrusted to the custody of an institution for the care of minor children or of any individual conducting such institution, and has been abandoned by its parent for two years, unless such child has been placed with such institution or individual by order of court, the assent of the parent to its surrender is a prerequisite to the right of the institution or individual to surrender it to strangers for adoption.

9. ACTION: Novel Remedies. While the novelty of an action is not conclusive against the right to maintain it; it justifies the exercise of extreme caution in permitting it when it involves the new application of recognized rules of law or equity.

10. ADOPTION: Oral Agreement: Specific Performance: Character of Proof Required. In an action to have the custody, care and control of a child decreed in plaintiff, in pursuance of an

oral agreement of the parent of such child, assuming that such an action will lie, plaintiff should be held to the clearest and most incontrovertible proof of the surrender.

11. **PARENT AND CHILD: Absolving Parent from Duty.** Neither a court of law nor of equity will absolve the parent from his duty and the child from his filial obligation, unless the conduct of the parent is of such a character as to have forfeited all parental right, and the interest of the child, as well as that of the state, are best subserved by so doing, save only when the parent has ·unequivocally surrendered parental control in the manner authorized by law; and when the law requires the consent of the parent to be evidenced in a particular way and form, that way and that form must be complied with.

12. **ADOPTION: Oral Agreement: Sufficiency of Evidence.** In an action to have the care, custody and control of a child decreed in plaintiff, pursuant to an alleged oral agreement made by the parent with plaintiff, assuming that such an action will lie, it is *held*, the evidence fails to show any enforceable contract on the part of the parent to part with her child.

13. ————: **Adoptive Parents: Charging for Care of Child.** One cannot claim a child by way of adoption from its natural parents, and at the same time charge for caring for such child.

14. ————: **Oral Contract: Specific Performance: Equity.** The equitable rules applicable to the specific enforcement of rights in property created by contract should not be applied to compel specific performance of an oral contract to permit the adoption of a child.

15. **PARENT AND CHILD: Presumptions: Appellate Practice.** Where, in an action to compel specific performance of a contract for the adoption of a child, the trial court awarded the child's custody to its mother, the appellate court may assume, in the absence of a contrary showing, that she is a proper person to have the custody of the child.

16. **ADOPTION: Oral Contract: Specific Performance: Equity.** Whether an action in equity to have the care, custody and control of an infant child decreed in plaintiff, pursuant to an oral agreement to permit plaintiff to adopt the child, alleged to have been made by the child's parent with plaintiff, will lie, *quaere*.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench*, Judge.

AFFIRMED.

*Byron F. Babbitt* for appellants.

(1)   An intended adoption, ineffectual as such by reason of some formal omission required by law, may still operate as a contract for adoption, which, on proper showing, will be specifically enforced and performance by the parties on one side of such an agreement removes the case from the statute of frauds. Wales v. Holden, 209 Mo. 552; Lynn v. Hockaday, 162 Mo. 111; Sutton v. Hayden, 62 Mo. 101; Healy v. Simpson, 113 Mo. 340; Gupton v. Gupton, 47 Mo. 37; Fuchs v. Fuchs, 48 Mo. App. 18; West v. Bundy, 78 Mo. 407; Anderson v. Shockley, 82 Mo. 250.   (2)   The validity of parol contracts like unto that pleaded in the amended petition has been repeatedly recognized in this State and courts of equity have uniformly decreed their specific performance. Wales v. Holden, 209 Mo. 552; Grantham v. Gossett, 182 Mo. 651; Lynn v. Hockaday, 162 Mo. 111; Nowack v. Berger, 133 Mo. 24; Teats v. Flanders, 118 Mo. 660; Sharkey v. McDermott, 91 Mo. 647.   (3)   Oral contracts of the kind stated in the petition when proven according to the standard of proof required and shown to have been performed, will be decreed to be specifically enforced. Wales v. Holden, 209 Mo. 552; Cases cited in 1 and 2, supra.   (4)   Upon an appeal in an equity case the appellate court is possessed of the whole case, both in respect to the facts and the law, and has power to deal with it as a chancellor. Luce v. Barnum, 19 Mo. 359.

*Furris & McCormack* for respondent.

(1)   The appellants in this cause had a right, under our statute, to adopt the child Robert without any contract or agreement, and without the consent of the respondent. Sections 1671, 1672, 1673, 1677, R. S. 1909. (2)   To bring a cause of this nature within the limits which would induce equity to uphold and enforce it, the proof to sustain it must be overwhelming in its proba-.

tive force, leaving no room for a reasonable doubt. Wales v. Holden, 209 Mo. l. c. 558; Hockaday v. Lyon, 200 Mo. 464; Brownless v. Fenwick, 104 Mo. 427; Alexander v. Alexander, 150 Mo. 597.

STATEMENT.—The amended petition in this case, in substance, avers that on the 30th of December, 1904, plaintiffs, at the special solicitation and procurement of defendant, entered into an agreement with her for the adoption of a certain infant son of defendant, the son then less than five weeks old, to the effect that defendant, who was the mother and then the sole natural guardian of the infant, relinquished at that time any and all claim which she had as the mother of the child to his services and labor and the fruits thereof and to his custody, society and companionship, and agreed that plaintiffs should have the custody and absolute control of the son until he should arrive at his legal age; that the son should be given plaintiffs' name and should thereafter be known and called by the name of Robert Beach, and that plaintiffs should have the right to govern and control the child as though they were his natural parents; that at the same time and by the same agreement plaintiffs agreed and did adopt the child as their own, to be known thereafter as Robert Beach, and agreed to govern, educate, maintain and in all respects treat the child as though he were their own natural offspring, and that he should have the right and should inherit from plaintiffs in the same manner and to the same extent as one of their own natural offspring; that thereupon and at the same time and pursuant to the agreement, defendant delivered and surrendered the child to plaintiffs, plaintiffs accepted the child and took it to their home and into their family where they have ever since afforded the child an appropriate home in which they have at all times supported, cared for and maintained and governed him with the same affection, regard and consideration

that they have bestowed upon their own natural children, complying in every particular, as they will in the future, with their aforesaid agreement. Plaintiffs aver that they are willing and abundantly able to carry out and perform the agreement; that at the time of making it the child was of a tender age and sickly, requiring and receiving at the hands of plaintiffs the most diligent and faithful care, nursing and attention; that plaintiffs have expended large sums of money in supporting the child and in administering to his necessities and wants generally and that the strongest affection and attachment has sprung up between plaintiffs and the child; that plaintiffs are entitled "in equity and in the highest spirit of the law to a continuance of the aforesaid happy relation and condition between plaintiffs and their said adopted son," to a continuance of his society and companionship and services and earnings until he attains his majority, "and that the status of said Robert Beach be firmly established as in equity as the lawful adopted child of plaintiffs with the accompanying right in said Robert to inherit from plaintiffs as their lawful heir." They aver that they have been at all times and are now willing to join with defendant in the execution of an indenture deed of adoption of the child, in accordance with and in performance of the aforementioned agreement and to that end have made frequent and repeated demands upon defendant to join them in the execution of such deed of adoption and have frequently and repeatedly tendered such deed to defendant for execution and have demanded that she execute said deed, but that fendant has wholly failed and refused to execute the same. Plaintiffs aver that they offer in open court to execute such deed of adoption upon their part, in full compliance and in accordance with the aforesaid agreement with the defendant. Averring that they have no adequate remedy at law, they pray the court "to decree that said Robert Beach is the lawful adopted son of plaintiffs, having the right to inherit from plaintiffs as

such; that said defendant . . . be held to have relinquished to plaintiffs all and every claim and right and every claim and right which she had, as such mother, to the custody and control of said Robert and to his services and labor and the fruits thereof, and that plaintiffs be decreed to have the lawful custody and absolute control of said Robert until he shall attain his lawful age," and for general relief.

The answer of defendant to this petition, admitting that Robert is her son and that he is of tender years, to-wit, four years of age, and that in December, 1904, he was committed to the care and custody of plaintiffs and that sometime afterwards the plaintiffs verbally agreed with defendant that they would adopt Robert as their true and lawful heir, as if their natural child, and that at that time she (defendant) did verbally agree that she would surrender all claim and control of the child as his mother to plaintiffs and that afterwards plaintiffs forwarded to her a deed of adoption for her execution and delivery and that she "then firmly refused to execute the same and so informed the plaintiffs, stating at the time that she would not execute any such deed," and that after this refusal plaintiffs, in writing, surrendered and relinquished all their right and claim to Robert and all their right and claim to have him adopted as their son. She further avers that since plaintiffs have had the care and control of Robert, she (defendant) has contributed toward his support and maintenance in the furnishing of clothing and the payment of cash to plaintiffs and that plaintiffs, in recognition of her right and claim to his companionship and love, permitted her to visit and have the company of the infant until the year 1908, wherefore defendant avers that there is no equity in plaintiffs' bill.

A general denial by way of reply was filed to this.

It appears from the record, as well as in the statements and briefs of counsel, that about the time of the institution of this action, defendant instituted proceed-

ings under the habeas corpus act to recover possession of the boy from plaintiffs, and that these proceedings by habeas corpus were had in the circuit court where the cause at bar was pending and that the case under the habeas corpus was heard and disposed of by the court along with the hearing on this case, the court awarding the boy to the mother, the petitioner herein. No appeal has been taken from this latter judgment, so that the only matter before us for determination is that arising under the petition, answer and reply above referred to, the issue here involved resting on the correctness of the action of the trial court in refusing to decree specific performance by the mother of the alleged parol contract for surrender to these appellants of her infant son and relinquishment of all of her parental rights in, to and over that son. The trial was before the court, being a suit in equity, and the whole of the evidence is before us.

This action was commenced September 28, 1908. The facts in the case are practically undisputed. Plaintiffs introduced oral testimony and letters written to Mrs. Beach by defendant, and the blank duplicate indenture of adoption which had been submitted to defendant for execution at St. Louis bearing date in December, 1906. It appeared that a like set had been sent defendant in 1905, but that she had destroyed them. These forms submitted again in December, 1906, were in duplicate, and attempted by the one instrument or indenture to carry consent of the mother to adoption of the boy by plaintiffs and relinquishment by her of all parental claim, the plaintiffs in and by the same instrument adopting the child as if a child by blood. It appears that the child Robert, the infant son of defendant, was born in a hospital in St. Louis, on the 28th of November, 1904; that Mrs. Beach, one of the plaintiffs, and her daughter Margaret, on or about December 28, 1904, called at this hospital to see this child, in answer to a published advertisement that some patient there had an

infant that the party desired to have adopted. On that day, going to the hospital, Mrs. Beach and her daughter Margaret met the defendant, who stated that she was the one who had advertised and she wanted to have her baby adopted; that she could not keep it; that her home was in Texas. She made no inquiry as to who Mrs. Beach was, or her circumstances or where she lived. That was all that took place at that interview. Mrs. Beach and her daughter told her that as all the children of their family were grown, they wanted to adopt a baby. They then left, promising to consider the matter, return the next day and advise her of their decision. On the succeeding day they again called on defendant. When they entered the room respondent said she was so glad they had come for the baby as she was going home the next day. Thereupon the mother of the baby packed up its clothes and delivered them to Mrs. Beach or her daughter, at the same time handing them a note which she wrote and sealed up and which she asked them to give to the baby unopened when he was twenty-one years old. She then carried the baby down to the lower hall of the hospital, where the manager of the hospital met them and asked them to step into a room. The manager took down the names and address of Mrs. Beach and her daughter and asked them if they wanted any adoption papers. Before they had a chance to answer, respondent spoke up and, according to the daughter, said, "No, indeed, that will not be necessary as I promised Mrs. Beach I will never cause her any trouble." According to Mrs. Beach, she said, "That won't be necessary, I will promise Mrs. Beach I will never cause her any trouble." "That," says Mrs. Beach, "was all the conversation had about the adoption papers at that time." Respondent then handed the baby over to Mrs. Beach at the outer door of the hospital and Mrs. Beach and her daughter left with the child. This was on the 29th of December, 1904. Mr. Beach was not then present and does not seem to have met defendant until about October, 1906.

From that day down to the time of the trial of his case, June, 1909, the boy remained with plaintiffs, having been given their name and cared for and treated by them as their own child. It further appears that after the taking over of the child by appellants, and sometime in January, 1905, his mother went to Texas, where she remained until sometime in the latter part of December, 1906. There appears to have been no personal intercourse between the parties from January, 1905, until along in December, 1906, the matter as to the child being carried on in the meantime by correspondence between them.

The first letter in which reference is made to the matter of retention of the child, that we are able to find among the correspondence is of date February 12, 1905, acknowledging the receipt of one of February 7, 1905, from respondent to Mrs. Beach. It is of date February 12th of the same year, and while purporting to be signed by Mrs. Beach, according to the testimony was written by her husband. After acknowledging the receipt of the letter from respondent of date February 7th, the writer states that she sympathizes with respondent in her grieving for Robert and continues: "We have become attached to Robert, but, I think, that you ought to have the child, being his mother. I think it is perfectly natural that you want Robert, as there is nothing so dear to a woman as her baby. The longer we have the baby the more attached we will become to him, so we will kindly ask how soon you can come after him." Again, and on the 11th of April, 1905, in a letter signed "Margaret Beach," which it is claimed was written by the daughter without the authority of her mother, this sentence occurs, after writing about the condition of the baby: "If you feel about the baby as you say you do in the letter we received to-day, it is imperative that you take him at once, as we all are growing exceedingly fond of him. We wish you to sign the adoption papers herein sent if you wish us to keep him. We

do this as the means of securing him to ourselves forever. Because at some future time you may desire to take him and at the same time it may be an impossibility to part with him. . . . There is a Bethesda Home here where you could put baby until such time as you can come for him if such is your intention. I think the charges are very reasonable and the Home has the attendance of the two most excellent baby physicians in town, one of whom we had for baby last time." Along with this letter duplicate blank adoption papers appear to have been inclosed. These appear to have been received by respondent but were destroyed by her—at all events, she neither signed nor returned them.

The next letter, also signed "Margaret Beach," the daughter, is dated April 26, 1905, and in this letter it is stated that if it is the intention of defendant to have Robert with her in Texas, "wire us to that effect, as a friend of ours starts for a nearby town in Texas Friday, and would be willing to take him. It is a person to whom great dependence can be placed. Please wire us as soon as you receive this. Received the gowns and put the one you requested on first." In a letter, signed, "Mrs. Margaret Beach," but which it is said was written by the daughter, dated May 7, 1905, the receipt by Mrs. Beach of a letter of the 30th of April from respondent is acknowledged, and then the letter continues, "Of course, I would like to keep Robert for you. I should dislike to have him go among strangers, because he is use (sic) to us. We have been to a considerable expense on his account, and as it is definitely settled we are not to keep him, can you make arrangements to send money to pay his expenses monthly, and make the time we are to keep him three months?" The rest of the letter contains statements of the progress of the child, his health, etc. By a letter of May 20, 1905, Mrs. Beach herself wrote respondent, that she was sorry her daughter Marguerite had written such a letter to her; that she had told her daughter not to and she had done it against

her wishes. The letter then continues: "I do not want to see Robert put into the Bethesda Home. I am perfectly willing to care for Robert, and Mr. Beach is willing also, but as matters have turned out we feel we ought to be compensated for what we have done and are to do. Pay no attention to what Marguerite says, but let your correspondence be with Mrs. Margaret Beach, 1331 N. Sarah, and let the money come in my name. We have no complaint to make against you, and you need pay no attention to the ravings of Marguerite."

In a letter of June 5th, signed in the name of Mrs. Beach, but written by her husband, the receipt of the letter of the 2nd of June with its inclosures is acknowledged, the letter saying, "and the amount inclosed is satisfactory." In one of August 20, 1905, from Mrs. Beach to the respondent, acknowledging the receipt of letters from her of August 8th and 15th, an account of the boy's condition is given and it is stated that his picture had been taken. The last one in evidence from Mrs. Beach, written for her by her son to respondent, and is dated October 2, 1906, and asks respondent to let the writer know when she will arrive in St. Louis and they will meet her at the railroad station. This comprises all the letters from appellants to respondent in evidence.

The letters of respondent in evidence are full of lamentations of the mother over the fact of forced separation from her child. We give such parts of them, in substance, as seem to throw light on the fact of an agreement to surrender the child:

In a letter dated June 2, 1905, the mother writes that she wants a picture that will show the hands of the boy and wants the camera put so close that it will be a good likeness, and it is stated in this letter that the writer, respondent, incloses money orders for $116 and she specifies how the money is to be applied; four dollars of it to be applied for a dozen of the boy's pictures, and the letter then continues: "You do what you think best. $112.00 is what I send for Robert's expenses from

December 30th, 1904, to June 30th, 1905, which rates his board at $17 per month, not what I desired it should be, for I wished to pay you at least $25, but at present this is the best I can do." July 20th, 1905, respondent wrote that she had held back money orders, waiting for the pictures and thinking she would make one letter answer, and she then writes that she will send the orders and not keep Mrs. Beach waiting any longer; that it calls for $34, which is for two months, from June 30th to August 30th, the writer asking Mrs. Beach to keep Robert until then, and saying: "I do not wish to impose upon your good nature, to take advantage of you in any way, and if you will only keep Robert till then (end of August, 1905), I will be so thankful. .. . . Should anything happen to me it is my wish you and Mr. Beach keep Robert always. Never let anyone take him from you. He is my child and if I should give him to you he will then be yours."

In a letter of August 28th, 1905, to Mrs. Beach, respondent wrote: "What arrangements can be made without me having to sign adoption papers? I fairly hate the word adoption and never see it in print nor hear it spoken without thinking of my own dear child. Will you and Mr. Beach be willing to keep Robert without my signing that paper? Nothing seems more awful to me than for a mother to sign away for life her child, only child. . . . Now what can be done? . . . . Let me hear what you and Mr. Beach will do." There is nothing more definite than this in any of them, beyond the expression of the belief that if Robert is left with appellants he will have a good home—the respondent expressing the great trial parting with her son would be and hoping that if she gives up Robert she can be permitted to see him. But the correspondence on her part closes with the above question, "Now what can be done?" This is the last of the respondent's letters in evidence, until she wrote one from St. Louis, February 24, 1908, referred to hereafter.

In the fall of 1906, respondent returned to St. Louis and stayed at the house of the appellants for some little time—some three or four weeks. The baby was then not quite three years old. This was the first time that appellant, Mr. Beach, appears to have met the respondent. He testifies that he talked with her on that occasion twice with reference to signing deeds of adoption, used all the arguments he could to induce her to sign the papers but she absolutely refused. The proposed adoption paper submitted to her at that time has been before summarized. It concludes thus: "It is expressly understood by the parties that nothing contained therein shall be construed to prevent the mother from visiting the child at all proper times and under proper regulations." In the final talk that Mr. Beach had with the respondent, sometime in December, apparently, 1906, when adoption papers were again submitted to her, respondent made objection to the form of the papers that were first submitted, and they appear to have been then put in the form above mentioned. Respondent and Mr. Beach talked over the matter of adoption, and according to the testimony of Mr. Beach, respondent agreed to come to the house and sign the papers the next day, he to have a notary there on that day. Respondent did not make her appearance that day but on the contrary left a message for Mrs. Beach that she would not come. That was the last time he saw her. Mr. Beach testified that he and his wife had offered to execute the deeds of adoption with her for the child but that she had declined twice and had never executed them. It appears from the testimony in the case that the family of the appellants consisted of Mr. and Mrs. Beach and six children, all grown, the youngest seventeen years old, Mr. Beach himself 65 years old; that appellants had been married 30 years; that the family objected to the long stay which respondent made at their home when she came there in October, 1906, and she was finally ordered away from the house. She appears

to have visited the house after that time, and even after her refusal in December, 1906, to sign the adoption papers, until in January or February, 1908, when it appears that Mr. Beach had refused to allow her to visit the house or to see the child. Mrs. Beach testified that after respondent had refused to sign the adoption papers, she then said she would send appellants money to take care of the child and that she had sent in all $150 and boxes of clothing, the latter as presents, which she had asked to send. She also testified that her husband, Mr. Beach, told respondent she could not come to the house any more because she would not consent to sign the adoption papers. A daughter of appellants testified that after they had refused respondent their house, respondent was passing the house and the daughter went out and asked her where she was staying. She told her, and when the daughter asked her about going back to Texas, respondent said, "I never intended to give Robert up." The daughter said, "Well, then, why did you leave him with total strangers and go back to Texas," and she (respondent) said, "There was an influence that drew me. . . . My sister was sick." This daughter further testified, answering the question of counsel for appellants as to whether she had heard the conversation between her father and respondent at the time Mr. Beach denied her the privilege of coming to the house to see the baby, that she had heard her father say to respondent, "Well, now, there is no use talking any more on the subject, you cannot come around any more; we might talk forever on the subject and we could get no further."

The refusal to allow respondent to see the child occurred in January or February, 1908. The last adoption papers were submitted to respondent after Christmas, 1906. After being forbidden the house in 1908, respondent wrote a letter to Mr. Beach, of date February 24, 1908, inclosing $30 to pay for her board while she was there which he received and retained. She

states in this letter of February 24th to Mr. Beach, that
the time she had talked with him, he had told her that
she could come once a month to see her son; that when
she went on January 29th to see him, it lacked just two
days of being five weeks since she had seen him and that
thereupon Mrs. Beach became very angry and said she
did not want her to come at all. This seems to have
ended the correspondence and intercourse between the
parties, and this suit, as well as the proceedings under
the habeas corpus act, was instituted. Which was first
begun does not appear from the record in the case.

At the conclusion of the evidence in the case, the
learned trial court announced that he would dispose
of the matter at once as he did not think that any amount
of reflection would change the result. He said, among
other things: "It is perfectly apparent to me that while
there is some elements here of adoption, the matter has
not been consistently carried through on the one side;
that the mother, as soon as she saw what she had done,
revoked and recanted her own act. That she had a
right to do that before she signed any papers, is too
plain for argument. Under the Scarritt Case (76 Mo.
565) and other cases in other states, the right to the
possession of an infant remains in the parent unless
by the means of some act on her or his part that right
is given away. . . . The law says that this mother
is entitled to this child and I have to so hold." On the
court's attention being called to the letters in evidence,
in the last of which the mother writes that she "guesses
that it is the best for the child" to remain with appel-
lants, and in one of which she states that she had re-
mitted board up to the 30th of August, the court con-
tinued: "I have taken all that into consideration; I
have taken into consideration the fluctuating sentiment
that this woman seems to have had with reference to
the disposition of this child, and I can also appreciate
under the circumstances, placed as she was with this
child on her hands, on the one side the natural affec-

tion that a mother would have, and on the other side the difficulty which she would naturally encounter in an effort to take care of the child; . . . it would make her probably inconsistent in regard to any statements that she would make. On the other hand, it is utterly inconsistent with the position of (plaintiffs) that they at once adopted this child and became father and mother for it and assumed all the obligations as such towards it, (and) that they should take money from its mother· for its keep, because those two things are directly inconsistent; they cannot be parents and at the same time be boarding-house keepers for the child. Taking that all into consideration, when we come to the real question in the case which is, has there been a consistent and entire specific performance of a contract to adopt? I am bound to find that there has been none." The court accordingly rendered judgment dismissing the suit. From this, after a motion for a new trial and exception to its overruling, plaintiffs below have duly appealed to this court.

REYNOLDS, P. J. (after stating the facts).—It is proper to say at the outset that we have very grave doubt whether this suit can be maintained at all.

Courts of equity deal with property rights alone, are concerned only with questions which affect property and exercise no jurisdiction in matters of wrong to the person. [Bispham's Principles of Equity (6 Ed.), top page 57.] They are concerned only with questions of property and the maintenance of civil rights. Injury to property, whether actual or prospective, is the foundation on which their jurisdiction rests. [Kerr on Injunctions (2 Ed.), sec. 1; In re Sawyer, 124 U. S. 200, l. c. 210; Brewer v. Carey, 148 Mo. App. 193, 127 S. W. 685, l. c. 688.] The only suggestion of a property right found in the amended petition, is the averment that the plaintiffs are entitled to the services and earn-

ings of the child until he shall have attained his majority under the law. The other averments go to the loss of the companionship and affections of the boy during his minority and averments of the expenditure of money in caring for and maintaining him. Beyond question, if money has been expended on the faith of the alleged promise of the defendant, passing over this expenditure as part performance, whatever amount so expended may be recovered back in an action at law, subject to any offset the defendant may have for payments by her on any of these accounts. Possibly, damages may be recoverable for the loss of the services. But if we are to look at this petition as one seeking to enforce the performance of a contract for personal services on the part of the boy, it is not maintainable. It is beyond question that specific performance of a contract for personal services will not be decreed by a court of equity. [Fry on Specific Performance (3 Am. Ed.), sec. 110; Arthur v. Oakes, 11 Circt. Ct. of App. 209, l. c. 217, and cases there cited.]

Somewhat analogous to the law of adoption is that concerning apprentices. At common law as well as by our statute, a legal apprenticeship can be created only by deed—at common law by deed of indenture—and with some exceptions, even under our statute, it can only be effected by deed of indenture. [2 Am. and Eng. Ency. (2 Ed.), Par. II, p. 489, and cases cited in notes 2 and 3; sec. 1686, R. S. Missouri, 1909; Lally v. Cantwell, 40 Mo. App. 44.] Looking into decisions under the law concerning apprentices, we have found none in which a court of equity has ever been asked to decree specific performance of an agreement to bind to apprenticeship. Several cases are found in which damages have been awarded at law for breach of the contract; none where equity has taken hold to enforce it.

The matter of adoption of children is regulated in this state by statute. [See chap. 90, R. S. 1899, chap. 20, art. I, R. S. 1909.] It was unknown to the com-

mon law. It is "in derogation of the common law, and purely of statutory enactment, and like all other similar statutes must be strictly complied with." [Sarazin v. Union Railroad Company et al., 153 Mo. 479, 1. c. 485, 55 S. W. 92.] While recognized and regulated by the Roman Law, the latter modified by the law of Justinian, our statute not only did not follow either, but is distinguished from these in many important particulars. So also it differs radically from the Code Napoleon. [Reinders v. Koppelmann, 68 Mo. 482, 1. c. 499; Hockaday v. Lynn, 200 Mo. 456, 1. c. 461, 98 S. W. 585.]

The matter of adoption in this state has a two-fold aspect. First, the taking over of the child by those who propose to adopt it. Second, the relinquishment of the parental right to the child by the parent or guardian or other authority charged with the custody of the child. Both of these matters are now regulated by statute. In chapter 90, Revised Statutes 1899, the sections applicable to the case at bar, or which throw light on the discussion, are sections 5246, 5247, 5248, 5250 and 5251. The sections covering the same matter and as amended by the Act of June 4, 1909 (Session Acts, 1909, p. 134), are now in chapter 20, article I, Revised Statutes 1909, designated as sections 1671, 1672, 1673, 1675, 1677 and 1678, the latter as well as section 1677 added by the Act of 1909 above cited. When this alleged right of action is said to have accrued and the case was instituted, tried and determined, our statutes of 1899 were of force. Section 5246, Revised Statutes 1899, provided that any person in the state, who should desire to adopt a child as his heir or devisee, might do so by deed, which deed should be executed and acknowledged by the person adopting such child and recorded in the county of the residence of the person executing the same, as in the case of conveyance of real estate. Section 5247 of the same statute provided that a married woman, by joining in the deed of adoption with her husband, should, with her husband, be capable of adopt-

ing any child; and section 5248 provided that from the time of filing the deed with the recorder, the child adopted should have the same right against the person or persons executing the same for support and mainte- nance and for proper and humane treatment as a child has by law against lawful parents, and such adopted child should have and enjoy, in all respects, all such rights and privileges as against the person executing the deed of adoption. It will be noticed that these provis- ions related solely to the act of the adopter. They re- quired no assent of the parent or child or of any one else. To the contrary, section 5248 expressly provides that it "shall not extend to other parties, but is wholly confined to parties executing the deed of adoption." Herein lies one of the most marked distinctions between the Roman Law and that of Justinian, as referred to by Judge NAPTON in Reinders v. Koppelmann, supra. Summarizing that very briefly and referring to the opin- ions of Judges NAPTON and LAMM in the Reinders and Hockaday cases, supra, for a full exposition of the Ro- man and Civil Laws and that of Justinian, under the Roman Law, the ceremony of adoption was a very sol- emn one and all parties, the adopter, the adopted and the natural parents, were required to be present. The sanction of the *curiae* was necessary to its validity. The law of Justinian changed this, substituting the simple proceeding of executing, in the presence of a magistrate, a deed declaring the fact of adoption, all parties to the adoption, the person giving, the person given and the person receiving being personally present to give their consent. Under the Roman Law, the son lost the suc- cession to his own father by being adopted. Justinian, however, provided that the son given in adoption to a stranger should stand in his natural position to his own father as before and that he merely gained by adoption the succession to his adopted father in case the latter died intestate. Under the Code Napoleon, adoption was prohibited before the adopted party attained ma-

jority, and the adopted retained all his rights in his own family. Under our statute, as remarked by Judge NAPTON in Reinders v. Koppelmann, supra, l. c. 500, and speaking of it as it was in force prior to 1909, so far as it provides for the status of the child adopted it, "is contained in a single section which simply declares the rights of the adopted to support and maintenance, and the same rights and privileges as a natural child has against the person executing the deed of adoption, which would of course include the right to inherit from the adoptive father or mother. The statute is silent as to whether the child loses the right to inherit from the natural parents and as to the capacity of transmitting property acquired either from the adoptive parent or from any other quarter." After pointing out the difference in this respect between the Roman or Civil Law and the Code Napoleon and our law, Judge NAPTON says: "Such a provision commends itself to our sense of justice, but it is not in our statute." In addition to these provisions of our statutes, as they stood prior to June 4, 1909, we have section 5250, Revised Statutes 1899, which provides that "whenever any minor child below the age of seven years, intrusted by its parents or either of them to the care and custody of any legally incorporated institution in this state for the care and custody of minor children, or to any individual who may conduct such an institution, shall have been abandoned by such parents for a period of two years, or whenever such institution shall have received therein for care and custody, a minor child of the age aforesaid, which thereafter shall have been abandoned by its parents for a period of two years," such institution may, with the approval of the probate court of the county or city in which it is located, execute a deed of adoption with all the force and effect of a parent, to any proper person or persons in this state who shall desire to adopt such child and who shall join in the execution of such deed for that purpose, and when any such deed

is acknowledged the child adopted shall be entitled to all the rights of lawful children against the adopting parent or parents, and such adopting parent or parents shall have and be entitled to all the rights of lawful parents against such adopted child or children to the exclusion of any rights of its lawful parents. Under this section there have been many instances in which the child, either relinquished or abandoned by the parents, has been committed by articles of adoption to strangers. There have also been cases in which, considering the welfare of the child, the parent having committed it to a charitable institution, has been held to the act. Where, however, the child has a surviving parent, unless it has been placed with the individual or institution by order of court, the assent of the parent to its surrender has invariably been a prerequisite to the right of the institution to surrender the child to strangers for adoption. [See in re Doyle, 16 Mo. App. 159; Orey v. Moller, 142 Mo. App. 579, 121 S. W. 1102.] In both these cases the right of the parent to revoke the relinquishment was recognized. It has, however, been a common practice in this state for parents, without any express statutory authority, to surrender their children to the adopter. Whether such surrender and relinquishment of parental right was valid prior to the passage of the Act of 1909, has never been adjudicated in this state in connection with the matter of adoption. We did consider it in Brewer v. Carey, supra, a case involving the validity of an ante-nuptial contract as to the religious training of any issue of the proposed marriage.

The county courts (sec. 5251, R. S. 1899, now sec. 1676) have also always had, and the probate court since 1909 (sec. 1678) now have the right, whenever it appeared that the father or mother of a minor child is habitually intemperate or inhuman or grossly immoral, to take the child from the custody of such parents and award the custody to some non-sectarian or incorporated

institution, but we had no statute prior to 1909, save the very incomplete reference to the subject found in section 5248 of the statutes of 1899, which in terms provided for this matter. The first act of our General Assembly recognizing the power of the parent to relinquish control over the child is the Act of June 4, 1909 (Session Acts, 1909, p. 134), now section 1677, Revised Statutes 1909. That provides for an absolute surrender by the parent of all parental rights over the child when effected by deed. This Act of June 4, 1909, amended section 5246 (now 1671), of the statutes of 1899, by striking out the words "or devisee," of which words Judge NAPTON, in the Reinders case, supra, said that they were meaningless, and by other merely verbal changes, and added two new sections (now 1677 and 1678) to the chapter concerning the adopting of children. The concluding section of the Act of 1909, recites: "There being now no plain statutory provision for the adoption of children, and there being persons within this state anxious to adopt children, an emergency within the meaning of the Constitution exists; therefore, this act shall take effect and be in force from and after its passage." As before noted, this present action was commenced prior to the Amendatory Act of June 4, 1909, so that this act has no controlling force in the case at bar. We refer to it merely by way of illustration. So much for the statutes.

We are cited to no case, and have found none after much search, in which an action such as this has been before the courts for determination. Without determining in this case, that an action of this kind is maintainable at all, it is entirely within the scope of the case and its decision to endeavor to apply to the facts in it, principles recognized in cases dealing with the fact of adoption. While the novelty of an action is no conclusive argument against it—dissenting opinion of Judge GRAY in Schuyler v. Curtis, 147 N. Y. 434, l. c. 452,—it does warrant us in exercising extreme caution

before entering upon a new application of recognized rules of law or of equity, especially when asked to apply these rules, applicable to contracts relating to real estate or other property, to a case such as this, a case in which is invovled the dearest and most sacred of all relations, that of parent and child, of mother and son.

The case, In re Scarritt, 76 Mo. 565, referred to by the learned trial judge, was one where, on proceedings under the habeas corpus act, the custody of an infant daughter was remitted to the father, notwithstanding his written promise to the grandparents that he would leave her in their care until she attained a named age. Before that age was reached, the father repented of his agreement, and, on the grandparents, the parties to whom he had committed his daughter, refusing to turn back the custody of his daughter to him, our Supreme Court awarded the daughter to the father, although in the interval between the father's surrender of her and his assertion of his parental rights over her, she had been in the care of the grandparents, raised by them, treated by them as their own, cared for by them in sickness, her wants provided for, the grandparents even, for her better comfort and health, erecting at great expense a new and costly residence, all this at much outlay on the part of the grandparents. We have referred to the Doyle case, to that of Orey v. Moller and Brewer v. Carey. In each one of these cases parental right was asserted in the most unequivocal manner. In the Doyle case, however, it being very doubtful, under the facts in the case, whether the father was recalling or had recalled his act of placing his child in the care of the charitable institution, and it being very doubtful whether the father was in a condition to maintain and properly bring up his child, this court continued the child in the care of the institution, as against the claim of others, strangers in blood, asserting a right to her alleged to have been derived from the father. In the Orey case, while the mother, in the absence of the fa-

ther and under his assumed abandonment of his wife and family, had renounced the child to a charitable institution which had subsequently entered into articles of adoption with other parties, these strangers in blood, the child was restored on the application of the father and mother, to parental control, although those strang·ers claimed, as here, to have expended large sums of money in the care, maintenance and clothing of the child and to have become greatly attached to it. In the Brewer case, notwithstanding the promise of the man about to marry, made to his proposed wife in the most solemn form possible, and as one of the inducements to entering upon the proposed marriage, that he would renounce to her the religious training of any child or children born of the contemplated marriage, and that any children born of the marriage should be brought up in the religious faith of the mother, even after the death of the mother, the contract of the father was held to be void as against public policy. This latter case arose prior to 1909. Even the Act of 1909, however, could have no effect or bearing whatever on that case; the question there presented was not one arising under or involving the law of adoption. We have found no other cases in our state shedding light upon this particular phase of this case.

There are many decisions of our Supreme Court in which the question has arisen as to whether legal adoption has in fact been accomplished. The question, however, has arisen in all the cases to which our attention has been called or which we have found by our own research, over the right of one claiming to have been adopted to share in the estate of the adopter, or to compel recognition on the part of the adopter, as against his estate, of the rights of the party claiming adoption, the claim of adoption resting on matters *in pais*, where no formal deed of adoption had been executed. That is the character of the cases most confidently relied on by the learned counsel for appellants, namely: Sutton

v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647, 4 S. W. 107; Healey v. Simpson, 113 Mo. 340, 20 S. W. 881; Teats v. Flanders, 118 Mo. 660, 24 S. W. 126; Nowack v. Berger, 133 Mo. 24, 34 S. W. 489; Lynn v. Hockaday, 162 Mo. 111-125, 61 S. W. 885; Grantham v. Gossett, 182 Mo. 651, 81 S. W. 895; Wales v. Holden, 209 Mo. 552, 108 S. W. 89.

Another case, that of Hockaday v. Lynn, supra, is interesting in its account of the history of the law of adoption, bringing the historical survey down to 1901, when the opinion was filed. Reading that in connection with Judge NAPTON's opinion in Reinders v. Koppelmann, supra, we have a very clear understanding of this very interesting subject. It is to be said of all of these cases that they were not only at the suit of the party claiming to have been adopted but in every one of them they looked to the assertion of the claim of that party to property rights. In Hockaday v. Lynn, supra, l. c. 464, Judge LAMM, after stating that adoption was unknown to the common law and in derogation of it, states that statutes providing for adoption have always been more or less strictly construed as against the adopted child, the adopted child being the one contending for or asserting property rights by reason of the claimed adoption. "Strict construction, however," says Judge LAMM, "is not extended to the act of adoption itself. This is liberally construed in favor of the child adopted." In all of the cases where a right is asserted by the one claiming to have been adopted in the property or estate of the adopter, our Supreme Court has invariably held that the proof to sustain the fact of adoption and to enforce the rights thereby arising must be so overwhelming in its probative force as to leave no room for a reasonable doubt in order to take the case outside of the Statute of Frauds. This is distinctly announced in Wales v. Holden, supra, l. c. 558, and cases there cited. It is further said in this case of Wales v. Holden (l. c. 576), that even when the rights of the child claiming

adoption are involved, and where it was claimed that
in the absence of a written contract of adoption, per-
formance in whole or in part by the one claiming to have
been adopted, was relied upon; that the perform-
ance relied on must be of a character not only consist-
ent with the reasonable presumption that what was
done was done on the faith of such a contract of adop-
tion but also that it should be unreasonable to presume
that it was done on any other theory.  While our law
provided for the execution of a deed, duly acknowledged
and recorded, as essential to adoption, our Supreme
Court has held, in the above and in many other cases,
that where the child, acting on the faith of the adoption,
has acted the part of a child to the promised adopter, has
lived with the adopter, conducted itself as a child, and
done all this under a promise of adoption, that the child
shall not be defeated of its share in the estate of the
adopter by the failure of the adopter, either to .execute
proper papers of adoption, or to recognize the child as
an adopted one in the dispostion of his property, solely
because the adopter has failed to execute the deed pre-
scribed by statute.  That is, in brief, that equity lifts
such a case out of the operation of the Statute of Frauds.
When the strict rule of part performance is applied
as against the child claiming adoption, and by virtue
thereof, attempting to assert an interest in property, on
what possible ground can it be claimed that it should
be relaxed when it is attempted, under and by virtue of
a claimed parol contract to that effect, to wrest
the child from his mother, to deprive the child of that
mother's loving care and attention, rend asunder the
ties that are universally recognized as the most tender
and dearest of all and commit that child, practically
for its whole future, certainly during the whole of its
minority, to the care of strangers to its blood, and to
those whose affections for it, at best, are the result, not
of those springing from the parental relation, but are
the outgrowth of habit and association?  If the child

can claim the right of adoption only on the clearest and most convincing proof of the fact of adoption, or is held, if relying on part performance upon his part, to the proof of such acts of part performance as are not only consistent with the reasonable presumption that what was done was done on the faith of a contract of adoption, but that it would be unreasonable to presume that it was done on any other theory, surely it is not unreasonable to require that one claiming as against the mother, the custody and care and upbringing of the son, and in that claim, denying the mother all the rights of a mother, even, as in this case, the right of visitation and association, should be held to be the clearest and most incontrovertible proof of the surrender. A court of law or of equity will not absolve the parent from her duty and the child from his filial obligation, unless the conduct of the parent is of such a character as to have forfeited all parental right, and the interests of the child, as well as the interests of the state, are best subserved by so doing, save only when the parent, unequivocally and unmistakably, has surrendered parental control in a manner authorized by law. When the law requires the consent of the parent to be evidenced in a particular way and form, that way and that form must be complied with.

Tested by the rules and principles above referred to, the evidence fails to show any enforceable contract on the part of the mother to part with her child. According to the undisputed testimony in the case, all that was discussed between the mother and Mrs. Beach and her daughter, when they approached the mother on the subject of the adoption of this child, was the care and attention to be given the child in case of its adoption by these appellants. While it is true that the answer of respondent admits that on that occasion she "did verbally agree that she would surrender all claim and control of the child as his mother to plaintiffs," there is not the slightest intimation on the part of the mother

that she intended to execute any paper by which she would relinquish her maternal care of, and give up her maternal rights to the child. To the contrary, when the person in charge of the hospital asked or suggested to the mother that deeds of adoption were necessary, she, the mother, declared that they were not necessary. It must be borne in mind that the contract counted on in the petition in this case is alleged to have been made on the 30th of December, 1904. Nowhere in the amended petition upon which the case was tried, is there any suggestion whatever of any other or further contract than the one then made. Apart from the above admission in the answer, what the testimony shows on this point is that at that time the mother, respondent here, desired to have her child adopted by some party or parties who would agree to adopt it and that Mrs. Beach, so far as the testimony shows, without any consultation with her husband, and of her own motion, expressed her willingness to take and adopt the child. She could do that even without the assent of the parent or the one adopted, even conceding that Mrs. Beach, a married woman, could do so alone (section 1672, R. S. 1909), or that she was empowered to act for her husband in the matter of adoption—points we do not decide. When afterwards urged to sign papers of relinquishment of her child, the mother distinctly refused. She refused even at the price of being excluded from the home of the appellants and deprived of all access to her son. By her subsequent acts, as well as all through the correspondence that passed between the parties, it is clear that the mother had never afterwards brought herself to the point of consenting to the absolute relinquishment of her parental right in her child, although willing, in the interests of the child to commit his custody to another. So that it is beyond dispute that the mother never, after December, 1904, even tacitly agreed to execute any contract by which she was to forever bar herself from parental control of her son, and it is clear

that on that date she not only did not specifically agree to execute papers but declared they were unnecessary.

On the part of these appellants, it is in evidence, by their own admissions, that the mother sent to them $150 for the purpose of providing clothing and paying for the support, the board of her infant son. She afterwards sent them $30 for her own board. These appellants received this money, retained it. As remarked by the learned trial judge, they cannot occupy the position of parents and at the same time charge for board, clothing and attendance upon the child. The two relations are absolutely inconsistent. The evidence further shows, beyond all question, that whatever arrangement for adoption on either side may have been entered into between the parties in December, 1904, that arrangement was subsequently, in 1905, and down to the fall of 1906, when the final refusal of the mother was given, not only repudiated by the mother but her repudiation acquiesced in by these appellants. The appellants, after this repudiation or refusal, with knowledge of it, assented to it and arranged to send the child to the mother. That this arrangement was not carried out then or was postponed or even abandoned, is no proof of a new contract. In point of fact, there is no pretense of any contract looking to adoption on either side, made after December, 1904. True we have the statement of appellants, both by petition and testimony, that they were always ready and willing to adopt the child, provided the mother would first relinquish her right to the child. This is no averment or proof of assent by the mother.

Learned counsel for appellants refers us to the cases of Gupton v. Gupton, 47 Mo. 37; Fuchs v. Fuchs, 48 Mo. App. 18; West v. Bundy, 78 Mo. 407, and Anderson v. Shockley, 82 Mo. 250, in addition to those before mentioned, in support of the proposition that equity will enforce the specific execution of a contract of this kind. Gupton v. Gupton is not in point. It was a case where the parent, an old man, had, in consideration of

promises of support and care, turned over his property to his child or children; the promise not being kept, he sued for a rescission of the contract. Moreover, it was a case seeking the enforcement of a right in property. The other cases cited relate to enforcement of specific execution of contracts for the conveyance of property. We do not think that the rules applied by courts of equity, when asked to enforce rights in property, cases wherein the power of a court of equity is invoked in aid of contracts relating to property, and it is asked to compel specific performance of a contract for its conveyance, are applicable or should be applied to a case such as the one before us.

We will add that as it appears that the learned trial judge awarded the custody of this child to the mother, we have a right to assume that she is a proper person to have that custody. In fact, no allegations to the contrary are in the amended petition in this case.

We repeat, that in deciding this case on the theory upon which it was tried, we decline to pass on the question of the right to maintain any such action. We have indicated with reasonable clearness what we think of that proposition, but, as it has not been argued by counsel in the case at bar, and does not appear to have been presented to the learned trial judge, it is not to be held as within this decision. We decide and determine this case on the facts here present and on the law, as we understand it, applicable to those facts.

Our conclusion on these is, that the judgment of the circuit court is correct. It is affirmed. *Nortoni* and *Caulfield, JJ.,* concur.