45 P.(2d) 927

**WOOLEY et al. v. SHELL PETROLEUM CORPORATION et al.**

No. 3935.

Supreme Court of New Mexico.

Feb. 8, 1935.

Rehearing Denied June 7, 1935.

Robert C. Dow, of Lovington, and C. R. Brice, of Roswell, for appellants Fowler and Bradley.

Hervey, Dow, Hill & Hinkle, of Roswell, Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., for appellants Shell Petroleum Corporation et al.

T. A. Whelan, of Lovington, and George L. Reese, Jr., of Carlsbad, for appellants Berry, Chesley, and Carter.

Tom W. Neal, of Lovington, W. I. Gamewell, of Canyon, Tex., Neal & Neal, of Carlsbad, and Earl C. Iden, of Albuquerque, for appellees and cross-appellants.

WATSON, Justice.

Mary L. Fowler died, intestate and without issue, seised of a tract of land later found to be of great value for its mineral content. Its title is the subject-matter of this litigation.

After this event, Clara Fowler and J. H. Bradley quitclaimed the land to O. O. Bradley, who quitclaimed it to Nora Berry. The latter conveyed interests to A. T. Chesley and Powhatan Carter. Thereupon Berry, Chesley, and Carter instituted suit against unknown heirs of Mary L. Fowler and unknown claimants of the land, and obtained a default judgment quieting their title. Thereupon Berry, Chesley, and Carter conveyed the surface rights to O. O. Bradley, reserving the minerals.

The title of O. O. Bradley is not beneficial, being admittedly in trust for Clara Fowler and J. H. Bradley.

The plaintiffs are descendants of Mary Anne Jenkins, mother of Mary L. Fowler, the intestate. In the first count of their complaint they set up the proceedings in the suit to quiet title and seek to vacate the judgment as a bar to their claim to an undivided one-half interest in the land. By their second count they seek a quieting of their title to the extent of an undivided one-half interest.

Nora Berry, one of the defendants, is a niece of the half blood of Mary L. Fowler, being the daughter of Charles E. Hooks, son of Armenta Cargill, whom Mary L. Fowler's father married after the decease of Mary Anne Jenkins, his first wife, the decedent's mother. Numerous other defendants hold leaseholds and royalty interests acquired from Berry, Chesley, and Carter.

Clara Fowler and J. H. Bradley, also defendants, filed a cross-complaint claiming, as against the plaintiffs, sole ownership of the land by virtue of an agreement of adoption and to leave property at death, enforceable in equity. They also claimed, as against the other defendants, that the transaction by which their title passed to Nora Berry was fraudulent as to them, and that the conveyances should be vacated.

There were many other pleadings which it will be unnecessary to notice. Suffice it to say that plaintiffs admit that Nora Berry is to be deemed an heir at law of the decedent and entitled to an undivided one-half interest in the land. They claim that they are heirs at law of the decedent and entitled to the other one-half interest, and claim further that the judgment quieting title does not bar them. Nora Berry claims that she is the sole heir at law of Mary L. Fowler, since her ancestor, father of the decedent, survived the ancestor of the plaintiffs, the mother of the decedent.

Both the plaintiffs and Nora Berry dispute the equitable rights or title of Clara Fowler and J. H. Bradley, and Nora Berry relies upon her title obtained from them as good, even if their equitable rights be sustained. The position of Chesley and Carter is the same as that of Berry. The claimants of leaseholds and royalties take the position that the equitable rights of Fowler and Bradley prevail over the claims of the heirs at law, but that the transaction with Nora Berry was a valid compromise which must be sustained; that Nora Berry is the sole heir at law of Mary L. Bradley; and that if she were not, plaintiffs are barred by the judgment quieting title. It seems expedient first to consider the claims of Clara Fowler and J. H. Bradley.

In 1892 Mary L. Fowler was living in Texas with her husband, Pascal N. Fowler. In that year death overtook the mother of Cora Bradley, aged six, and Clara, aged two, and their father, J. H. Bradley, orally agreed with the Fowlers that they "should take the children into their home and treat them in all respects as their own children, and that they would legally adopt said

girls, and at the death of the said Fowlers, they would leave to said children such property as they owned."

The Fowlers did not legally adopt the girls nor make any testamentary disposition in their favor. In 1895, with the written consent of J. H. Bradley, the children were legally apprenticed to the Fowlers. It was claimed that all concerned intended and believed this apprenticeship proceeding to be one of adoption. The trial court refused so to find.

In all other respects the Fowlers observed the agreement. They took the children into their home, called and caused them to be called by their name, and treated them in every respect as their own children, except that they were taught to name their foster parents as "uncle" and "aunt," respectively.

For their part, the children were dutiful beyond the ordinary conduct of child to parent, helping them in their poverty and caring for them in their declining years. The trial judge said in his very carefully considered opinion, "Evidence could not show more loyal or faithful performance of duty than these girls rendered to the Fowlers. Hardships and privations which they endured in their faithfulness to Mr. and Mrs. Fowler evoke sympathy and consideration, as well as admiration, from all acquainted with the facts."

In 1910 the Fowlers came to New Mexico, the girls coming with them as members of the family. Pascal N. Fowler made homestead entry of the land here in controversy. The family moved onto it, the girls being the mainstay in making the necessary improvements and the family living.

In 1911 Pascal N. Fowler died intestate and without issue. The widow and the girls continued to reside on the homestead. Mary L. Fowler, as widow, received the patent in 1914. She died in 1916 intestate and without issue, Cora and Clara remaining in possession. The former died in 1917 intestate and without issue, and J. H. Bradley, her father, is admittedly her sole heir at law. Clara continued in possession of, and residence upon, the land to the time of trial.

During the years of residence in New Mexico, both of the Fowlers repeatedly stated in substance to numerous persons that Cora and Clara were their adopted children and would inherit their property. The girls themselves always believed that they had been adopted and would inherit, and were led so to believe by the repeated declarations of their foster parents.

■ It is claimed for Fowler and Bradley that they should be held to have inherited the land. The theory offered is generally referred to as specific performance in equity of a contract to adopt children. It is exemplified in this jurisdiction in Barney v. Hutchinson et al., 25 N. M. 82, 177 P. 890, 893. Except for the distinction between the written contract there involved and the oral contract here presented, we need not hesitate to say that we are committed in favor of the relief. The trial court denied it on the theory

262

that it is precluded by Texas law, controlling in this case.

▮ Among others obstacles of Texas law thought insurmountable is that such a contract as this is void as against public policy. It seems to have been so declared in Hooks v. Bridgewater, 111 Tex. 122, 229 S. W. 1114, 1118, 15 A. L. R. 216. While counsel have ably argued to the contrary, we feel constrained to accept this decision as controlling evidence that the contract of 1892 was void as matter of Texas law, and that if the relief were sought in Texas, it would be denied.

▮ Generally, equity will not enforce a promise the consideration for which is illegal. Generally, the validity of a contract is determinable by the law of the place of contracting. Unless this case is one for varying these general rules, they are decisive and there must be an end of the Fowler-Bradley claim.

▮The denunciation of this class of contracts by the Texas Supreme Court is really a disapproval of adoption statutes like ours, for they contemplate the very thing denounced. 1929 Comp. St. § 2-101 et seq. Of late years certain provisions have been added to our statute designed to insure the suitability of the home into which a child is to be inducted. Id. But our statutes forbid that we should say, with the Supreme Court of our sister state, that such a contract as this is necessarily immoral or impolitic. Of course, as that court said: "It tends to the destruction of one of the finest relations of human life, to the subversion of the family tie, and to the reversal of an ordering of nature which is essential to human happiness and the security of society."

Nevertheless, we recognize the wisdom of providing an alternative for the case where the ordering of nature will not secure a home for the child.

While adoption is provided for in Texas, it does not involve any responsibility for the education or the support of the child, or any right to its obedience or service. It does not relieve the natural parent of any of his obligations. It merely designates the child as heir. Eckford v. Knox, 67 Tex. 200, 2 S. W. 372; Taylor v. Deseve, 81 Tex. 246, 16 S. W. 1008. This condition of statute law enabled the Texas Supreme Court to take the position it did.

▮ As to the legal status of Cora and Clara Fowler, we have no conflict of laws. No more in New Mexico than in Texas does this unperformed promise make them children by adoption. Barney v. Hutchinson, supra.

▮ But this contract is much more than one for Texas adoption. It involves every element of a New Mexico adoption. It is to be deemed a promise in behalf of these children to obey and serve the Fowlers, in exchange for a promise by the latter to support and educate the children and to leave all of their property to them. Such a contract, according to our jurisprudence, is not only unobjectionable, but

so morally binding that equity, to satisfy conscience, indulges the fiction that what should have been done was actually done, in order to prevent the fraud which would result from applying the law of descent to children who have fully performed their obligations on the faith of an unperformed promise.

This contract, moreover, is larger than that involved in Barney v. Hutchinson, supra. Here is an express promise to leave property at death. The parties agreed only to give the child Frank the status of a natural son. Their legal right to make testamentary disposition was not affected. Cf. Fisher v. Davidson, 271 Mo. 195, 195 S. W. 1024, L. R. A. 1917F, 692. As here, no testamentary disposition was made.

█ Nor is the promise to leave property at death itself any less legitimate in Texas than here. Jordan v. Abney, 97 Tex. 296, 78 S. W. 486; Hooks v. Bridgewater, supra. Of course, in either jurisdiction such promise requires something in the nature of consideration. Here the objection runs to the consideration. It is not the promise of the Fowlers that offends public policy. It is the promise of the father made in behalf of Cora and Clara. We are not asked to enforce the bad promise. It has already been performed. We are asked to refuse recognition to the good promise. To sustain this judgment on the ground now in question is to contribute little, if anything, to the practical enforcement of Texas public policy,

and is to sacrifice our own. We are asked to sanction what we consider fraud as a deterrent of what Texas considers immoral and impolitic.

Perhaps no legal force should be attached to the additional facts that the affected parties long since brought the contract with them to New Mexico and became domiciled here; that much has here been done on the faith of the promise, if not in actual performance of its consideration; and that the property involved is New Mexico real estate, the devolution of which is our own concern. These facts at least dispose us to uphold our own policy unless clear principle forbids.

█ To the abstract question whether a promise made in another state, where it is illegal, may stand in this state, where it would not have been illegal, as the consideration for a promise to leave property at death, an affirmative answer might be difficult to arrive at. Nor can it be maintained that the statutes of descent may be varied on equitable grounds. But to suppose that these admissions are decisive of this case is to misapprehend the true principle of Barney v. Hutchinson, supra, as we view it. The relief afforded in that case is generally classified as specific performance of contract. There are analogies to that equitable remedy, but the classification is not accurate. A specific performance of a contract to adopt is impossible after the death of the parties who gave the promise. Equity was driven to the fiction that there had been an adop-

tion. That fiction being indulged, the case was not one of specific performance. It remained merely to apply the statutes of descent and to decree the succession.

Resort to this fiction was impelled by the child's strong equity. That equity, it is true, was conveniently referred to as a fully performed consideration. It is apparent, however, that the child's performance of the promise made in his behalf did not figure in the case as the technical "consideration" for a promise to be enforced. It figured as the child's equity. That equity existing, nothing but fraud could result if the law of descent were allowed to take its course.

It is the power of equity to prevent frauds that was really exercised in Barney v. Hutchinson. Acting under that head of jurisdiction, it merely employed equity's well-known maxim, with a reliance also on equitable estoppel. That we correctly appraise the decision, the following paragraph fairly attests: "Notwithstanding that the contract to adopt the father of the plaintiff in this case made no mention of property rights of the adopted son, we are satisfied that equity and justice demand the specific performance of the contract, to the end that Frank C. Barney be adjudged the adopted son of Annie C. Hutchinson, and that the right of succession of the appellant, the daughter of Frank C. Barney, be recognized in accordance with the statutes in such cases made and provided. In so holding we do no violence to the statutes of inheritance.

We simply hold that equity will consider that Frank C. Barney was in all respects the legally adopted son of the Barneys, and that the surviving spouse of Annie C. Hutchinson, as well as her collateral heirs, cannot be heard to dispute that which the ancestor would be estopped from asserting. The laws of inheritance consequently are not impaired, but follow their natural course. They operate upon the relation created by the contract the same as though the legal adoption had taken place."

The weakness of this class of cases, considered as resting upon a valid enforceable contract, is readily apparent. The Texas courts do not stand alone in having discovered it. Cf. Mahaney v. Carr, 175 N. Y. 454, 67 N. E. 903. Its strength lies in inherent justice. Equity, abhorring injustice, and having its origin in the inadequacy of legal remedies, and possessing powers all its own, has developed the remedy, denominating it specific performance; a remedy, the granting or denial of which rests in sound discretion. It is freely used to prevent fraud, never in aid of it. Winne v. Winne, 166 N. Y. 263, 59 N. E. 832, 82 Am. St. Rep. 647; Lee v. Bermingham, 199 Ill. App. 497.

A recent decision of the Supreme Court of Texas supports our view that decision of this case is not properly to be reached by pigeon holing it as one for specific performance, and then simply applying the law of contracts. Cubley v. Barbee, 73 S.W.(2d) 72, 83. There it is said: "* * * We are of the opinion

that the real classification of the remedy is that of estoppel." We thoroughly agree that the principle of estoppel is one of the two powerful weapons with which equity is armed to enable it to prevent the injustice here threatened. Cf. Barney v. Hutchinson, supra.

The court that held the heirs at law of Mrs. Hutchinson estopped, as she herself would have been, to assert that there had been no adoption in law, will hardly hesitate to hold these heirs at law estopped from reliance upon the technical or legal insufficiency of this consideration.

■ When a court is called upon to recognize foreign law, it is bound to consider domestic public policy. Thus perceiving Barney v. Hutchinson in its true principle, and viewing the conduct of these children as raising an equity calling for this kind of relief rather than as the technical consideration of an executory contract, the decision constitutes a declaration of New Mexico public policy not to be ignored.

■ The territorial Supreme Court laid down the rule that "the validity of a contract executed in a sister state will be determined by the courts of this jurisdiction according to the laws of, such sister state as construed by the highest court of such state, * * * unless such a construction conflicts with some settled policy of this jurisdiction." Atchison, T. & S. F. Ry. Co. v. Rodgers, 16 N. M. 120, 113 P. 805 (syl.). We find no statement of law which requires one jurisdiction to forego its own public policy to maintain that of another.

■ A state's statutes for the prevention of fraud, and we think the decisions of its highest judicial tribunal as well, "embody a fundamental policy." Emery v. Burbank, 163 Mass. 326, 39 N. E. 1026, 1027, 28 L. R. A. 57, 47 Am. St. Rep. 456.

■ It is as repugnant to our jurisprudence that the promise to leave this property to these children should go unfulfilled, as it is offensive to Texas jurisprudence that the children's father should have bartered their custody and services. We may grant that principle would demand that we decree nothing in furtherance of the latter promise, however proper it may be deemed according to our standards. That wrong, however, is now beyond prevention. Our chief concern is with the other wrong which, according to our polity, now impends. It would be odd if it should transpire that the solicitude of two great states for the welfare of children should so result that a wrong done them in Texas in 1892 should require us to do them another wrong in 1935.

If Mary L. Fowler had done what good faith required her to do, and what she omitted to do perhaps only through ignorance; if she had legally adopted Cora and Clara or had made her will in their favor, the invalidity of her bargain with their father would have been entirely immaterial. This invalidity might be fatal if we must have a performed consideration to support specific performance. We do not deem it so when all we need is an equity to invoke the court's power to treat as

done what should have been done. No true principle, we conclude, requires that we deny equity to our own citizens regarding the devolution of immovable property within our jurisdiction, because of the public policy of another state which denounces as void the renunciation of paternal rights and obligations.

■ This discussion and conclusion we think dispose of the other obstacles found in Texas law, viz., that Mary L. Fowler, being under the disability of coverture, could make no contract (Jordan v. Abney, supra; Dyess v. Rowe [Tex. Civ. App.] 177 S. W. 1001), and that the contract was unenforceable as within the statute of frauds (Hooks v. Bridgewater, supra). Our own fundamental policy in regard to this species of fraud need not and will not yield to these objections of Texas law.

■ We come now to matters of our own jurisprudence urged as sufficient to sustain the judgment. And first it is claimed that the statute of frauds prevents enforcement of this oral contract. Here Barney v. Hutchinson stands no longer as authority. The contract there involved was written. However, several of the decisions there cited did involve oral contracts, and weight of authority supports the view that full performance on the part of the children themselves and of the parent who at first assumed to obligate them, takes the case out of the statute. Note, "Specific performance of contract to leave property to child in consideration of his living with promisor," 44 L. R. A. (N. S.) 756, subtitle "V. Proof of contract. * * * b. Statute of frauds," page 770 of 44 L. R. A. (N. S.). Note, "Specific performance of contract to adopt," 27 A. L. R. 1325, subtitle, "Enforcement as affected by Statute of Frauds" page 1340 of 27 A. L. R.

■ Jones v. Rocky Cliff Coal Mining Co., 27 N. M. 41, 198 P. 284, is cited to the proposition that "under a parol agreement to convey land, the payment of the full purchase price, without some further part performance, such as delivery of possession, the making of valuable improvements, etc., is not sufficient to vest an equitable title in the purchaser." This rule is concerned with the payment of the "purchase price," in that case money. It does not apply where the consideration is services and companionship, extending over a long period of time, the value of which could not have been estimated when the contract was made. The cases collected in the notes just cited make this distinction.

■ Fowler and Bradley contend that they did have possession. So they did, so far as the contract lent itself to delivery of possession; it having been contemplated that Mary L. Fowler should retain the property so long as she should live. The mixed possession cannot, we think, be relied on as that possession which may actively aid to take a parol contract to convey out of the statute. But, under such a contract as this, the absence of a change of possession has not the ordinary effect

of casting doubt upon the truth of the claim that a parol agreement was made.

That the girls made improvements is abundantly shown. They did not make them under claim of ownership and upon land of which' they had been given possession. It argues, however, their own belief in the contract and makes it especially inequitable that the results of their toil should go to strangers.

In short, everything about this contract has been performed except the one act omitted by Mary L. Fowler. As already pointed out, we regard this as not strictly a case of specific performance. The basis of the remedy is equity's power and strong inclination to prevent a species of fraud. The relief is not to be prevented by every objection that would defeat specific performance, particularly not by invoking the statute itself designed to prevent fraud. Much might be yielded, however, to the idea of specific performance, and still we have here as strong a case against the operation of the statute of frauds as the case where a vendee under a parol contract has been let into possession, paid the purchase money, made improvements, and paid taxes.

It is also contended that the cross-action is barred by limitation. The theory urged with some assurance is that it is one founded upon an unwritten contract; that it accrued when Mary L. Fowler died; and that it was barred four years thereafter by 1929 Comp. St. § 83-104.

As already indicated, we do not classify this as an action "founded" on contract.

Something in the nature of a contract there was, of course, and must have been. But the relief is based on something else.

Nor do we consider that the cause of action accrued at the death of Mary L. Fowler. This results from the nature of the relief invoked. The subject-matter of the litigation is a certain tract of land. Ownership of it is the question in controversy. It is not asked that the land be taken from one party and decreed to another. It is not proposed that the natural heirs at law be required to convey. The court is called upon merely to declare who succeeded to the title on the death of Mary L. Fowler. All parties being in a court of equity, it is the equitable title that is involved and will control.

The true nature of this remedy is made very plain in Barney v. Hutchinson, supra. There we arrived at the equitable title by *considering* Frank C. Barney to have been legally adopted, though he was not, and by estopping the natural heirs from asserting the contrary. We disclaimed power to vary the statutes of inheritance. That is to say that the fiction resorted to stood as the fact, upon which the statute was made to operate.

The result of this theory is that, in contemplation of equity, the Fowler girls were, from the moment of the decease of their mother by adoption, sole owners of the property as her heirs at law. The status is declared, not created.

This view was taken in Clow v. West, 37 Nev. 267, 142 P. 226, 228, cited

in Wood on Limitations (4th Ed.) § 272 b (3). So considering, the Supreme Court of Nevada held applicable the general rule that "the statute of limitations does not run against the holder of the equitable title in possession," to which principle it cited numerous authorities and might have cited many others.

So long as the equitable owner is undisturbed in possession, he does not "have to" sue to convert his equitable title into legal title. Copelan v. Monfort, 153 Ga. 558, 113 S. E. 514. That is to say, that under the circumstances here present, the cause of action, though it may have long existed, did not accrue within the meaning of statutes of limitation.

Except these two, we have found no cases of this particular class in which the defense of limitation was involved. But we are well persuaded that the Nevada court announced the true principle. This cross-suit is essentially an action quia timet, which the Fowler girls could bring or not as they saw fit so long as their possession was undisturbed. Cf. Superior Oil Corporation v. Alcorn, 242 Ky. 814, 47 S.W.(2d) 973.

Hanner v. Moulton, 138 U. S. 486, 11 S. Ct. 408, 410, 34 L. Ed. 1032, relied on to the contrary, is not in point. It was there distinctly pointed out that the "interest" asserted "was not an interest of any kind, legal or equitable, * * * in the land, but only the right promptly to disaffirm the sale and institute a proceeding, in a reasonable time, to have it set aside, and thus reacquire * * * the land."

We think, therefore, that the cross-action was not barred.

The trial court found that the contract to adopt was actually originally entered into, and that the subsequent apprenticeship was agreed upon as a means of insuring continued custody. We can neither overturn those findings nor agree that the apprenticeship actually brought about merged all prior agreements and constituted record evidence of the actual contract not to be varied by parol. We see nothing inconsistent between apprenticeship and adoption as known to Texas law.

And, finally, it is contended that the enforcement of this contract is precluded by 1929 Comp. St. § 117-110, providing: "Lineal and collateral securities in all cases are hereby forbidden, but the heirs and legal claimants of any person who may have made any written contract or agreement shall be responsible for said contract or agreement to the extent of the lands limited or bequeathed, in such case, and in the manner prescribed by law."

In interpreting this section, it must be noted that it was enacted in Spanish. "Lineal and collateral securities" was "lineales y colaterales aseguramientos." We have no doubt of the correctness of the contention that "aseguramientos" should be translated "warranties." The statute then has a well-defined purpose and meaning. Cf. 2 Blackstone Comm. 301, as to war-

ranties, lineal and collateral. It is scarcely to be doubted that the Spanish original is a translation from an English draft. The two translations have proven too much for the word "warranties" and it has become "securities." Thus understood, the section has no bearing here.

The numerous objections to the relief prayed have been urged upon us with vigor and ability. They are not trivial. Yet we think they should not prevail in a court of equity.

For more than ten years following the death of Mary L. Fowler, Clara Fowler remained in continuous and uninterrupted occupancy and enjoyment of the property and paid the taxes. Then appeared Nora Berry, claiming to be the sole heir of Mary L. Fowler. In the ensuing dispute both women were represented by competent counsel, and no fraud was practiced. Clara Fowler's attorneys, to whom she disclosed the facts, and who made further investigation, advised her that she would be unable to maintain her claims. Negotiations led to a compromise. It was agreed that Clara should have the surface rights and Nora Berry the mineral rights. The necessary deeds were exchanged.

In view of our present conclusion on the equitable rights of Clara Fowler, it is plain that she made an unfortunate compromise. We know now that she should have had both surface and minerals: we know the great disparity in value between them, and that Nora Berry should have had neither. It is of the very nature of compromise, however, that the parties weigh their chances of prevailing and risk their judgment. Frazier v. Ray, 29 N. M. 121, 219 P. 492.

This is a fully executed compromise. It was induced on the part of Clara Fowler by a mistake of law. But she had every opportunity to have and did have competent and able counsel. Nora Berry took no advantage and exerted no pressure except firmly to maintain a claim of right possessing so many features of merit as to convince able counsel and the trial court, and as to induce the plaintiffs to risk expensive litigation of it.

It will not do to say that the equitable rights were here so plain that Nora Berry's claim was without foundation and that the transaction amounts to fraud. We find nothing to avoid the operation of the general rule, based on important considerations of public policy, that equity will support a compromise though based upon a mistake of law, and nothing to bring it within any of the decisions relied upon.

Counsel for Fowler and Bradley seek to give the case another aspect by urging that there was a misrepresentation of fact, viz., that Nora Berry was the sole heir at law of Mary L. Fowler. This question of fact includes one of law. It is here seriously maintained by Nora Berry, as a matter of law, that since her ancestor survived the ancestor of plaintiffs, the inheritance is hers to the exclusion of the plaintiffs. We shall as-

sume, but without deciding, that in this she is wrong.

Even so, we are unable to perceive any fraud or overreaching in her bare claim to be the sole heir at law. Both women knew that Mary L. Fowler's mother was not the mother of Nora Berry's father, and that there might be claimants other than Nora Berry. Nothing more is asserted than that the latter had a clue to the identity of the decedent's mother, which Clara Fowler did not have. Even this is denied, and the court did not find and was not asked to find that it was true. This feature of the case, if it has any merit, has not been sufficiently developed. Against the court's express finding that "there was no fraud connected with said transaction," we do not see how these cross-plaintiffs can prevail without some findings or requested findings of knowledge possessed by Nora Berry and concealed from Clara Fowler, putting the latter at a disadvantage.

We have thus concluded that when Mary L. Fowler died, Clara and Cora had enforceable equities entitling them to be adjudged the owners of this property, but that by an unimpeachable compromise the mineral rights passed to Nora Berry. This is fatal to the case of the plaintiffs unless there be merit in their suggestion that the compromise effected by Nora Berry inures to their benefit. The theory is that Nora Berry, being their cotenant, could not prejudice or obliterate their title by acquiring an outstanding title. The point is merely stated, not in any manner pressed. Counsel in opposition take the position that if the equitable rights of the Fowler girls be recognized, there was no cotenancy between the plaintiffs and Nora Berry. They cite Roberts v. Thorn, 25 Tex. 728, 78 Am. Dec. 552, and Alexander v. Sully, 50 Iowa, 192.

This point, interesting and important as it is, we think not available to the plaintiffs. Besides not being developed here, it seems to have been first raised on the appeal. We do not find any such theory of recovery in the complaint or in the requested findings and conclusions. It is a matter upon which the trial court was not called to pass. If such a theory had been presented for litigation, we have no means of knowing how Nora Berry and her grantees might have met it. We might have had different evidence and other findings.

The other appeals need no consideration, since Nora Berry's claim to have acquired the mineral rights is here sustained, and there is no controversy among those holding under her.

The judgment must be reversed. The cause will be remanded for settlement of a judgment consistent with this opinion. Unless otherwise moved within twenty days, costs of these appeals will be taxed against the plaintiffs.

It is so ordered.

SADLER, C. J., and HUDSPETH and BICKLEY, JJ., concur.

ZINN, J., did not participate.