67 P.(2d) 235

## In re CANDELARIA'S ESTATE.

## CANDELARIO et al. v. DE LUCERO.

### No. 4178.

Supreme Court of New Mexico.

April 6, 1937.

Mechem & Hannett and Donald B. Moses, all of Albuquerque, for appellants.

George R. Craig, I. V. Gallegos, and Elfego Baca, all of Albuquerque, for appellee.

HUDSPETH, Chief Justice.

This is an appeal from the judgment of the district court of Bernalillo county, appointing Juanita Candelaria de Lucero administratrix of the estate of Juanita Candelaria, deceased. The appellants are collateral kin of the deceased, who at the time of her death was a widow without lineal descendant. The appellee claimed the appointment as an heir by adoption. The cause originated in the probate court where appellee's petition was denied. Under stipulation, the testimony taken in the probate court was read before the chancellor who also heard other witnesses. The district court made findings of fact, reversed the judgment of the probate court, and issued an order declaring her to be the adopted daughter of deceased.

The appellee is the natural and legitimate daughter of Sofia and Donato Duran. When the appellee was about seven months old she was placed under the care, custody, and control of Trinidad Garcia Candelaria, the mother of decedent. The mother of appellee, Sofia, is a blood relative of deceased and also claims to be an adopted daughter of the deceased. She was placed in the custody of the deceased upon the death of her mother when she was twelve years of age

along with her sister and brothers. They became members of deceased's household, and all were reared by deceased and her mother, Trinidad. Deceased applied for and was granted letters of guardianship over Sofia. After Sofia's marriage she and her husband, Donato Duran, continued to live with the deceased and her mother for about three years. They were all living in a small house when the appellee was turned over by her parents to Trinidad.

The evidence supports the finding that there was a complete and absolute surrender of the child to Trinidad. When appellee was about seven years of age, Trinidad died and left a purported will, of which the following is part: "* * * leave in the possession of my daughter Juanita Candelaria two tracts of real estate, one in the old Town of Albuquerque, and the other situated in Los Barelas; the one at the Old Town so that it be delivered by my said daughter to Gregorita Romero, and the other one for the purpose of turning it over to Juanita Duran, both of which I raised ever since their infancy." Appellee also bore the name of Juanita Candelaria, and after the death of Trinidad the appellee continued to live with deceased, who treated her as a daughter, educated her, and supported her without aid from her natural parents. Her natural parents were poor, and received aid from appellee's foster mother. The evidence fully supports the findings that the deceased treated appellee in every way as a daughter, had great affection for her, referred to her as her adopted daughter, and repeatedly stated to her friends and neighbors that all of her property would go to the appellee at her death.

A short time before her death, the deceased summoned Ismael N. Duran, a notary public, before whom she executed a warranty deed conveying the land situate in Los Barelas, referred to in the purported will of Trinidad, to appellee. Ismael N. Duran, appellee's witness, testified in part, as to the conversation between him and deceased, as follows:

"Q. And what was the conversation you had with her at that time? A. Out of curiosity, I mentioned to Mrs. Candelaria, the deceased, I, myself, realizing that our folks hardly ever settle their affairs before they die, I said 'Mrs. Candelaria, have you got your affairs settled, have you ever made a will' I says 'you have got quite a bit of property and you got some relatives' and these are the words she used, I can remember, she said 'Yes, I haven't got no will made yet' but because I mentioned to her, I says 'remember, you have got some relatives here and you have got some relatives in Santa Fe' she said 'no, no, no, no, there is only one heir that I have' and she pointed to Juanita Candelaria Lucero, her husband was there, she pointed to her and she says 'I have got it in mind to call you in ten days or two weeks, I want to get everything straightened out' she says, but she never did.

"Q. Did she say anything about drawing a will? A. Yes, she said she was going to draw a will, she told me she was going to call me to draw a will; those are the words she used."

The deceased left property of the estimated value of $2,500, and depended upon the appellee as her aid in business matters, and had a card in the savings department of a local bank upon which was the memorandum "one adopted daughter, Juanita Candelaria Lucero, dated 6-17-29."

Immediately after the death of the deceased, the father of appellee aided her in procuring counsel in her efforts to establish her heirship, but testified, as did her mother, one of the protestants in this case, that there was no agreement or contract of adoption between the deceased and the natural parents of appellee. Sofia testified: "I left her there for company as I used to go there all the time myself to visit them."

It is admitted that there was neither statutory adoption of appellee by the deceased nor a written agreement to adopt the appellee. There is no direct evidence of an agreement or contract of adoption.

Appellee relies upon the rule in Roberts v. Roberts (C.C.A.) 223 F. 775, 776, in proving the adoption contract. That court said:

"We are satisfied from the evidence that Charles J. Roberts was the father of plaintiff. This, together with the conceded fact of his childless married life, gave to him a natural motive and imposed upon him a moral duty to plaintiff and her mother, to make plaintiff his child in law as she was in nature. These two facts enter into all of plaintiff's evidence, giving to it reasonableness and probative force. The record at the time the plaintiff was taken by Mr. and Mrs.

Roberts states: 'Infant indentured to C. J. Roberts.' * * *

"The argument by which we are asked to reverse the decree is that there was no direct and clear evidence of an agreement to adopt at the time Myra J. Roberts was received into the family of Charles J. Roberts. There is good reason why such evidence is wanting. All of the parties to the transaction are dead, and Myra J. Roberts was herself a babe at the time of the adoption. It seems to us that in such a case it is not necessary that the court first have direct proof of the making of the contract, and then proceed forward from the contract thus established to the conduct evidencing its existence. We think it is possible to reverse that process, and if the statements and conduct of the adopting parents are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed, then the agreement may be found as an inference from that evidence."

Appellee also relies upon a finding and conclusion by the court that Sofia and Donato Duran, parents of appellee, were estopped from objecting to the appointment of appellee as administratrix. Sofia, a party in the court below, did not appeal.

The main question in the case is whether or not the evidence established the contract of adoption. The rule seems fairly well established that: "If the alleged contract is oral, or alleged to have been lost, the proof of it must be so clear, cogent, and convincing as to leave no reasonable doubt

as to its existence and terms, and the proof must show not only that a contract existed but that the particular contract alleged existed." 2 C.J.S., Adoption of Children, § 26, p. 396.

Appellee cites Barney v. Hutchinson, 25 N.M. 82, 177 P. 890; Wooley v. Shell Petroleum Corp., 39 N.M. 256, 45 P.(2d) 927, and numerous Missouri decisions and other cases collected in annotation in 27 A.L.R. 1325, some of which are suits involving agreements as to inheritance rather than as to adoption. In Iowa, New York, and other states, the only mode of adoption is statutory, but their courts enforce contracts with respect to the right of the child to property of the foster parent. Morris v. Trotter, 202 Iowa 232, 210 N.W. 131. The Missouri courts have apparently gone further in upholding oral contracts of adoption than those of any other state. See Shelp v. Mercantile Trust Co., 322 Mo. 682, 15 S.W.(2d) 818. Prior to the year 1909 the consent of the parents was not essential in that jurisdiction, Beach v. Bryan, 155 Mo.App. 33, 133 S.W. 635, but in the late case of Kidd v. St. Louis Union Trust Co., 335 Mo. 1029, 74 S.W.(2d) 827, 830, the court quoted with approval Judge Valliant in Wales v. Holden, 209 Mo. 552, 108 S.W. 89, 96, as follows: "When a court of equity is invoked to enforce an oral contract void under the statute of frauds on the ground of part performance, it recognizes and appreciates the danger that the statute was designed to avoid, and grants relief only when it is sure, beyond a reasonable doubt, that to refuse its aid would result in allowing the statute to be made in that case an instrument to protect fraud. A court of equity therefore requires that a part performance relied on to take the case out of the statute should be of a character, not only consistent with the reasonable presumption that what was done was done on the faith of such a contract, but also that it would be unreasonable to presume that it was done on any other theory. Can it be said that the mere fact that an orphan child, in indigent circumstances, was taken into the family of comparatively wealthy people, reared and educated even on an equality with their daughter, is reasonably consistent only with the theory that she was an adopted child—consistent only with the theory that at his death his own daughter should make equal division with her of the estate which was the product of his whole life's work? If that is so, how dare a man take such a child into his family?" And in this same opinion quoted Asbury v. Hicklin, 181 Mo. 658, 81 S.W. 390, 393, as follows: "When, as in this case, and in consonance with this doctrine, a court of equity is called upon to establish and enforce a contract of this character in the teeth of the statute of wills and of the statute of frauds and perjuries, and to set aside a disposition of valuable property made in conformity with the requirements of those statutes, there is devolved upon the chancellor the greatest responsibility, perhaps, that ever attaches to his high office. And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the utmost confidence, proving existence of the contract, its terms and conditions, and a sub-

stantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of such an extraordinary prerogative."

In Benjamin v. Cronan (Mo.Sup.) 93 S. W.(2d) 975, 979, that court stated: "It is true that plaintiff, when of tender years, was taken into the Benjamin home, but such is not necessarily consistent only with an agreement to adopt. Sitton v. Shipp, 65 Mo. 297; Wales v. Holden, supra. Neither is adoption effected necessarily by recognizing and referring to a child as an adopted child. 1 C.J. 1373, and cases cited in note 34. Nor will adoption necessarily be effected by the alleged adoptive parent, in an application for life insurance, naming the alleged adopted child as the beneficiary and designating such child as son or daughter as the case may be."

The question as to the necessity of consent of the parents to adoption resolves into a matter of statutory construction. Our statute, 1929 Comp.St. § 2-104, provides that "a legitimate child cannot be adopted without the consent of its parents, if living together." The construction of such statutes seems uniform. It is stated in Roberts v. Cochran (Miss.) 171 So. 6, 7, as follows: "Our adoption statute had its origin in the civil law, not in the common law. There was no such proceeding known to the common law. Consent of the parents, if living, lies at the foundation of our adoption statute. Jurisdiction of the subject matter cannot be acquired without it. The first step is

the filing of a petition in the proper court. The petition is jurisdictional in character and must state the facts required to give jurisdiction. 2 C.J. Secundum, Adoption of Children, pp. 417–419, § 37. Willis v. Bell, 86 Ark. 473, 111 S.W. 808; Furgeson v. Jones, 17 Or. 204, 20 P. 842, 3 L.R.A. 620, 11 Am.St.Rep. 808; In re Cozza, 163 Cal. 514, 126 P. 161, Ann.Cas.1914A, 214; In re Lease, 99 Wash. 413, 169 P. 816; Truelove v. Parker, 191 N.C. 430, 132 S.E. 295; Chance v. Pigneguy, 212 Ky. 430, 279 S.W. 640; Keal v. Rhydderck, 317 Ill. 231, 148 N. E. 53; Luppie v. Winans, 37 N.J.Eq. 245."

The parents of appellee have never been separated. They testified, without objection, that there had been no consent given by them, in fact that there had been no discussion of the matter of adoption between them and the deceased at any time.

Trinidad did not adopt the child. If she had done so, appellee and deceased would have been sisters. She referred to her in her purported will as Juanita Duran. She had reared other children not her own and it does not appear that she adopted any of them. The parents of the appellee were members of the household at the time of the surrender of the child. We know historically that it was and still is the custom with many of the native people to turn the first born over to the care, custody, and control of its grandmother. The mother of appellee claims that she was adopted by the deceased, and if that were true Trinidad would occupy the position of a grandmother to the appellee. It

would appear that the testimony of the parents of appellee to the effect that there was no contract of adoption is not improbable, and being uncontradicted should be given some weight as against an inference based upon the conduct of the parties and statements of the other party to the supposed contract. Walker v. Smith, 39 N.M. 148, 42 P.(2d) 768, Arnall Mills v. Smallwood (C.C.A.) 68 F.(2d) 57.

There are several Missouri cases holding that under certain state of facts the foster parents and their heirs are estopped to assert that the parents did not adopt the child in the manner provided by law, but we have found no case holding that a parent of the child who asserts no consent by him was given and no contract of adoption was entered into by him with the alleged adopting parent is estopped from asserting that fact. "The measure of the operation of an estoppel is the extent of the representation made by one party and acted on by the other." 2 Pomeroy's Equity Jurisprudence (3d Ed.) p. 1445. Under the theory of equitable estoppel the ultimate fact to be established is the status of the child alleging adoption. The burden of proving this fact was upon the appellee and it was necessary for her to establish it by evidence so clear and convincing as to satisfy the chancellor beyond a reasonable doubt. Shelp v. Mercantile Trust Co., supra.

The following appears among the finding of fact: "That it is the custom among the native people of this State to take children into their homes by and with the consent of their natural parents and care for, educate them, treat them as their own children, and to consider them as adopted children who would inherit as though they were their own children." Witnesses, upon whose testimony this finding was based, also testified to knowledge of adoption of children by native people by the usual statutory proceeding. It also appears that there was some confusion in the minds of these witnesses as to the meaning of the word adoption. Desiderio Montoya, one of the witnesses, testified: "A. I can't say but it seems to me that many people that raise children now, of course it is different now, years ago they raised a child, they kept him with them until he got to be the age of 21 or 25 until he got married and they always helped him out some way or another."

The largess of the foster parent or the bestowal of a reward for services performed is not the same as the conferring of a right to inherit a child's part. Moreover the power and duty to determine by whom property passes by a will or descends by inheritance is vested in the courts. If the trial court's finding quoted above should become the rule of decision in this jurisdiction, it would seriously affect the titles to real estate and introduce many elements of danger.

The relinquishment of the control of the child by its parents, especially to a blood relative, is not tantamount to an

agreement that the child may be adopted. In re Lind's Estate, 90 Wash. 10, 155 P. 159. "The mere fact that a child of another is received into a home, cared for, and educated cannot indicate that such a child has further claims upon those who took it in, and that there is an implied agreement to adopt the child." 2 C.J.S., Adoption of Children, § 26, p. 398.

Much of the testimony tendered by appellee is of the same character as that by which nuncupative wills were established before the repeal of our verbal will statute. Laws 1921, c. 83.

In Plomteaux v. Solano, 25 N.M. 24, 176 P. 77, 79, Mr. Justice Parker, after his long residence among the native people of New Mexico, speaking for the court, said: "The inhabitants of the then territory of New Mexico were largely of Mexican parentage, and it would seem but natural to adopt the law of wills which theretofore governed them. The language of the treatise is sufficiently clear to disclose beyond doubt that verbal wills were as efficacious at that time to pass title to real property as were written wills. In fact it appears that the practice of making verbal wills was more common than the practice of executing written wills, which was perhaps due to the lack of the general knowledge of letters. The act of 1852, while subject to criticism in some particulars for lack of definite expression, was declaratory of the law theretofore in force in said territory and of the civil law of Spain."

The Legislature saw fit to overturn a long-established custom and declare a new public policy as regards one method by which owners of property control its disposition at their decease. Adoption of a child is another method of affecting the descent of property, and in considering the rule as to the character of proof required of agreements to adopt we are not unmindful of the public policy established by the Legislature in the case of verbal wills. The testimony quoted indicates that the deceased was of the opinion that a will was necessary in order to carry out her desire that appellee have all her estate. Our statute of descent provides that an only child shall inherit all of the property of a widowed mother.

It appears to us that the probate court was right in holding that appellee failed to establish the agreement to adopt by the character of evidence required under the rule hereinbefore stated. Pantel v. Bower, 104 Kan. 18, 178 P. 241; Arfstrum v. Baker (Mo.Sup.) 214 S.W. 859; Haubrich v. Haubrich, 118 Minn. 394, 136 N.W. 1025.

Another point relied upon for reversal is that appellee failed to show that it would be a fraud upon her not to enforce the alleged agreement of adoption. Wooley v. Shell Petroleum Corp., supra. Her natural parents were poor and had five other children. Appellee greatly profit-

ed by what deceased did for her in affording her a home, educating and rearing her. She sacrificed nothing by remaining with the deceased. She married at nineteen and continued to receive help from her foster mother. "Where the promisee shows no substantial change for the worse in his position in consequence of the agreement, relief will be denied." Winkelmann v. Winkelmann, 345 Ill. 566, 178 N.E. 118, 120, citing Snyder v. French, 272 Ill. 43, 111 N.E. 489. We are in accord with the pronouncement of the Illinois court.

While fully conscious of the well-established rule that the question as to whether relief should be granted or denied is addressed to the conscience of the chancellor and that many considerations enter and are to be weighed, we feel that there is not only a failure of satisfactory proof as to the making of the agreement to adopt but the evidence fails to show any fraud upon appellee by reason of the failure to enforce the alleged agreement. For the reasons stated the judgment and order of the district court should be reversed, and the cause remanded for further proceedings in accordance with this opinion, and

It is so ordered.

SADLER, BICKLEY, and BRICE, JJ., concur.

ZINN, J., did not participate.