**PAULOS v. JANETAKOS.**

No. 4259.

Supreme Court of New Mexico.

Sept. 28, 1937.

W. A. Keleher and Theo. E. Jones, both of Albuquerque, for appellant.

John F. Simms, Robert Hoath La Follette, and Augustus T. Seymour, all of Albuquerque, for appellee.

SADLER, Justice.

The plaintiff (appellant) sued before the district court of Bernalillo county to enforce an alleged executory agreement to devise property in exchange for personal services. At the trial, upon plaintiff resting his case, the defendant, William B. Janetakos, individually and as executor of the estate of Mary Cornetto Janetakos, deceased, made a motion to dismiss, the equivalent of a demurrer to the evidence. After argument, the trial court sustained the motion and dismissed plaintiff's complaint. From the judgment of dismissal the plaintiff prosecutes this appeal.

The contract was pleaded in the complaint as follows: "That in said year 1921, the said Mary Cornetta Janetakos promised the plaintiff that if he would go to live in her household in the City of Albuquerque, New Mexico, and care for her in sickness and in health as a son until the time of her death, he should have and be entitled to all her

property, both real and personal, as fully and to the same extent as if he were her sole lawful issue."

Then follow allegations of acceptance of the contract by plaintiff and performance on his part from the year 1921 until March, 1933, when the contract allegedly was repudiated by the said Mary Cornetto Janetakos by her refusal to let plaintiff live longer in her household or further to perform the contract, although he alleged himself at all times ready, able, and willing to perform.

The making of the contract and performance thereunder were denied in defendant's answer and certain affirmative defenses pleaded, among them, the statute of frauds. Other affirmative defenses related chiefly to breaches of the supposed contract on plaintiff's part. It should be here stated that Mary Cornetto Janetakos was a widow at the time of entering into the alleged contract. However, in 1932 she married William B. Janetakos and died in 1934, leaving a last will and testament whereby she devised all her property to her surviving husband, the defendant herein. The case having been disposed of below as on demurrer to the evidence, it is of first importance to examine plaintiff's evidence.

The alleged contract was stated in evidence by plaintiff as follows:

"Q. Did you later start to work for her? A. While I was running the confectionery business I had a failure and I stayed with her until I was getting the bankruptcy papers here, and that is when I became more acquainted with Mrs. Cornetto at her place, and while I was laying over to take the bankruptcy I began to work for her as she agreed with me to do it.

"Q. Did she make you any kind of proposition? A. Yes.

"Q. What was that proposition? A. Well, she didn't have anybody at all, that was the first thing she told me and I rendered some service to her there for private quarters, cooking, she was always asking me to come into her place, and she told me if I stayed in her place she would give me everything she had at her death, and she told me that one million times, all the time I was there.

"Q. What were you to do for her? A. Well, I was supposed to take care of her in the way of cooking or anything that she needed to be done around the house.

"Q. And did she say how the property would go to you at the time of her death? A. Well, she just absolutely told me that I didn't need to worry about anything at all, that everything that she had she was going to leave it to me provided I stayed there and took care of her as much as I can.

"Q. Did you accept that proposition? A. Yes."

Again, on cross-examination, plaintiff stated substance of the contract as follows:

"Q. How did she bring this question up of your being her son? A. This is the way she brought it up, this is exactly what she said, 'Now, if you will stay here and take

care of this place, take care of me, you don't need of anything, everything I have got I am going to leave it to you' she said.

"Q. What did she say you were to do, what were going to be your duties? A. Well, it wasn't necessary for me to do anything except be there and take care of her business, I didn't have to do a whole lot, that is the way she expressed herself, that I was at her favors and do a little work for her around the house and all I could do for her, which I did."

Several witnesses testified to statements by deceased that when she died all she had belonged to "Louis," the plaintiff. One witness quoted her: "I took Louis to raise it and keep it just like my son, nothing ashamed, nothing dirty, nothing that I can be ashamed before nobody, but just like it was my son, and whenever I die everything I got go to Louis."

Others testified: "When I die everything belong to him." "Anything I have belongs to Louie."

The testimony of Andy Pettini, a witness for plaintiff, as nearly furnishes corroboration, if it does, as anything coming from the lips of witnesses. He stated:

"A. Well, one time I finish a job in Flagstaff, I come back to Albuquerque, any time I finish a job I come back to Albuquerque, she had some picture there in the room and I call attention 'Mary, who is that picture there'; she say 'It is my boy'; 'You don't have no boy'; she say 'Yes, it is a boy that is room here, he do all my work, care for

me, if I die everything belong to him'; that is what she tell me.

"Q. Whose picture was that? A. Louie's picture.

"Q. Louis Paulos? A. Yes.

"Q. Did she ever say anything else about her property on any other occasion? A. She just tell me if he stay over there and care for her and care for the property, that is all.

"Q. Then what? A. 'Then when I die, everything belong to him.'"

Pete Urioste, plaintiff's witness, testified:

"Q. Did you ever talk with Mrs. Cornetto about what she was going to do with her property? A. Many times.

"Q. What did she say? A. The only thing she would say when she would arrive that all she had was for Louie, she said.

"Q. How many times did she tell you that? A. I can't tell you how many times because she told me many times.

"Q. What were the words she used? A. That all that she had was his."

In July, 1926, plaintiff being absent in Texas, Mrs. Cornetto wrote him, "I sure hate for you to be away from me. Just think if anything happened to me nobody here in this big place you want it to go to the state or county you think this over."

A month later, plaintiff being still absent, she wrote him: " * * * and when I got your letter this morning I sure got sick again Louis you know I am alone and it

is very hard for me some times you say you don't want to come back here. well louis I told you I would leave you all I had some day, and if you only want to make me sick and unhappy I thought if you would spend a few months their and come back in fall I think things will be better dont go any farther away it seems to me you change your mind every day louis when you left here you did not have to go. you went yourself, and it was not so bad 400.00"

The plaintiff testified that he accepted under the contract, went to live at the hotel owned and operated by Mrs. Cornetto, remaining there continuously from 1921 to 1926. He spent the years 1926 and 1927 in Texas, in and around Borger in said state, returning to Albuquerque and Mrs. Cornetto's home about January 1, 1928. As to the nature of the services rendered by him under the alleged contract, the plaintiff seems to have been the handy man about the place. He cooked, fixed plumbing, did errands; when Mrs. Cornetto was sick (and she was sick often) he called in the doctor and took care of her; met trains, painted, kalsomined, cleaned rooms, washed dishes, etc. So ran the testimony of the plaintiff.

During this time Mrs. Cornetto financed him in numerous small business enterprises. He had a fish market in 1922 in property owned by her. She put $200 into the fish market. This business continued about a year. Then he went into tailoring business in her building. She put up the money, about $400. Then he sold tailor-made clothes to individuals. Sold real estate in 1928, 1929, and 1931. As above stated, he was in Texas for two years, 1926 and 1927. Plaintiff testified the trip to Texas was made with her consent and that he visited Mrs. Cornetto every two months and was in continuous correspondence with her. He further testified that he remained with her constantly from date of his return from Texas (though one of his witnesses placed him in restaurant business in Los Lunas for six months during this period), except possibly a short trip to El Paso, until 1932 when Mrs. Cornetto gave plaintiff $20 and told him to get out; to go to Santa Fe or Gallup; that she didn't want him around any more. About this time she married the defendant, W. B. Janetakos, who claims under a will devising him all her property. She died in 1934. At the date of the alleged contract plaintiff was 23 years of age and Mrs. Cornetto, a childless widow, about 55 to 57 years of age.

At the outset, the appellee suggests that the practice prevailing in this state of treating a motion for judgment or motion to dismiss as a demurrer to the evidence, whether the action be one at law or a suit in equity, is by persuasive authority not the correct rule. He argues, if the case be one in equity, that by moving to dismiss at the close of plaintiff's case the defendant is not demurring to the evidence, as at law, but is submitting his whole case on plaintiff's evidence, just as though he had stated defendant did not wish to offer any evidence. The distinction urged has never been made in this state and the practice to the contrary

seems too thoroughly imbedded in the minds of the bench and bar to attempt at this late day to give different effect to such a motion in an equity case from that attending in an action at law. Rogers v. Balduini, 28 N.M. 102, 206 P. 514; Sanchez v. Torres, 35 N.M. 383, 298 P. 408; Mansfield v. Reserve Oil Co., 38 N.M. 187, 29 P.(2d) 491; Merchant's Bank v. Dunn, 41 N.M. 432, 70 P.(2d) 760.

■ The defendant denied the contract, pleaded the statute of frauds, Comp.St. 1929, § 117-101 et seq., and also invoked Comp.St.1929, § 45-601, requiring corroboration of the contract and its performance, and further denied that the contract had been performed, if it ever in fact was made. We are met at the outset with the rule applicable to plaintiff's testimony when it is tested as on a demurrer to the evidence. The demurrer admits the truth of all of the plaintiff's testimony tending to support the material allegations of the complaint and reasonable inferences flowing therefrom, thus ignoring in plaintiff's favor conflicts in the testimony. Merchant's Bank v. Dunn, supra, and cases cited. In the light of these rules we shall now proceed to a consideration of the points presented.

We have not had before us a case exactly like the one now reviewed. The nearest are Barney v. Hutchinson, 25 N.M. 82, 177 P. 890; Wooley v. Shell Petroleum Corp., 39 N.M. 256, 45 P.(2d) 927; and Candelaria v. De Lucero, 41 N.M. 211, 67 P.(2d) 235. These cases related to written or oral unexecuted agreements of adoption. In the Barney and Wooley Cases where it would have operated a fraud on the beneficiaries of such agreement to afford no relief, we considered as done that which should have been done, thus bringing to their aid the laws of inheritance. In the Candelaria Case, both because the contract of adoption was not satisfactorily proved and because, if so considered, its nonenforcement was no fraud on the beneficiary who greatly profited by benefactions of the alleged promisor, relief was denied.

■ That contracts of the kind here alleged, where substantially performed and proved by clear, cogent, and convincing evidence, may be made the basis of relief in equity in the nature of specific performance, notwithstanding the statute of frauds, is no longer open to question. See exhaustive annotations in 69 A.L.R. 14, supplemented in 106 A.L.R. 742; 25 R.C.L. 306 et seq., §§ 120–125; 58 C.J. 1060.

"An oral agreement to devise property is like any other agreement for the conveyance of lands as far as the statute of frauds is concerned. If it is an oral promise it is within the operation of the statute of frauds, and hence is not of itself an enforceable contract, and in ordinary cases cannot be established by parol evidence alone. But an agreement to leave property to compensate for services is not within the statute of frauds if the contract is fully established by written correspondence, even though the letters are lost and their contents proved by oral testimony. Furthermore, if the contract is an oral one to devise land and is

reasonably certain, equity may decree a specific performance if there has been such a part performance as will take a parol agreement to convey land out of the statute of frauds." 25 R.C.L. 307.

"It is settled by a line of authorities which are practically uniform that while a court of chancery is without power to compel the execution of a will, and therefore the specific execution of an agreement to make a will cannot be enforced, yet if the contract is sufficiently proved and the usual conditions relating to specific performance have been complied with, then equity will specifically enforce it after the promisor's death by seizing the property which is the subject matter of the agreement, and fastening a trust on it in favor of the person to whom the decedent agreed to give it by his will." 25 R.C.L. 311.

Rules applicable to contracts of this general nature may be deduced from our own decisions hereinabove cited. The agreement must be established by clear, cogent, and convincing evidence. Wooley v. Shell Petroleum Corp., supra; Candelaria v. De Lucero, supra. The services rendered must be incapable of compensation according to any definite pecuniary standard. Wooley Case, supra. And, finally, assuming existence of the oral contract, to warrant equitable relief and thus avoid the statute of frauds, it should appear that to leave it unperformed will operate as a fraud upon the promisee. Wooley v. Shell Petroleum Corp., supra; Candelaria v. De Lucero, supra.

With these principles in mind we are constrained to hold that the evidence adduced in support of the existence of the alleged contract, viewed most favorably to plaintiff, is sufficient to withstand the demurrer. The plaintiff testified to it. His statements must be taken as true upon demurrer. So accepted and considered in the light most favorable to him, we have the case of a childless widow, around 57 years of age, proposing to plaintiff, a young Greek immigrant 23 years of age, that if he would come to live with her, practically assuming the place of a son toward her, take care of her and assist around the place, she would leave him all her property at her death.

Both parties concede that such a contract asserted after death of the promisor requires corroboration under Comp.St. 1929, § 45-601. The trial judge apparently took the position that written corroboration was necessary, though defendant concedes such is not the case. We conclude also that corroboration under the statute mentioned was shown. We are not unmindful of the rule stated at 69 A.L.R. 196: "Where the evidence indicates that it was the thought of the promisor to give the promisee certain property, not to execute an obligation in his favor, or to contract for services to be rendered in consideration of the promise to give, the agreement is testamentary in character, and will not be specifically enforced by a court of equity."

But the annotation continues: "However, it has been held that, although the agreement

to will property in consideration of the promisee moving in, living with, and caring for the promisor, is testamentary in character and ambulatory, yet, after performance on the part of the promisee of substantially everything to be done on his part, this objection is not tenable. To hold the agreement revocable under such circumstances would be to permit a fraud which a court of equity could not sanction."

In this connection observe the testimony of the witness Pettini quoting the promisor referring to plaintiff as "my boy" and finally:

"Q. Did she ever say anything else about her property on any other occasion? A. She just tell me if he stay over there and care for her and care for the property, that is all.

"Q. Then what? A. 'Then when I die, everything belong to him.'"

Also note the statement in the promisor's own handwriting in a letter to plaintiff while he was absent in Texas, suggesting an escheat of the property if she should die with him absent; and her further statement in another letter, "well Louis, I told you I would leave you all I had some day. * * *"

■ The rule is that the corroborating evidence must be such as in and of itself tends to establish the essential fact necessary to a recovery. Bujac v. Wilson, 27 N.M. 105, 196 P. 327. That such is the tendency of Pettini's testimony, at least, we think there can be no doubt. Pettini, it is true, does not quote the promisor as saying she had "agreed" or "promised" plaintiff if he did the things on his part to be performed she would leave him all her property. Merely, that if he did them the property was to "belong" to him. Forced as we are to draw every favorable inference reasonably flowing from the facts disclosed, we deem it permissible, if the fact finder sees fit, to infer that this proposal was in its nature a promise. It might appeal to the fact finder as more reasonable so to assume than that plaintiff, a stranger to promisor's blood, rendered the services shown in the mere expectation of a bounty. We refer to the case of Simons v. Cromwell (C.C.A. 2d) 262 F. 680, reviewed on second appeal Cromwell v. Simons (C.C.A.) 280 F. 663. Upon the first appeal the court held that language, not so strong as that here presented in corroboration of plaintiff's story of the contract, made out a prima facie case sufficient to go to the jury. On the second appeal the same court, differently constituted, held it insufficient, but, under an application of the doctrine of the "law of the case" established by the former holding, permitted a judgment in plaintiff's favor to stand. The first decision supports the conclusion we reach. The second does not in reality oppose it in view of the stronger facts here present. We conclude that plaintiff made out a prima facie case on the existence of the contract alleged.

■ This brings us to a consideration of the second important issue, proof of which is essential to recovery, viz., performance

on plaintiff's part. Here, too, must the plaintiff have corroboration. Substantial performance may be deduced from his own testimony as hereinabove recited. It is an essential to equitable relief. 69 A.L.R. 110–112, and cases cited. Testimony of several other witnesses, particularly of Eulalio Naranjo, who served as janitor for about seven years beginning in 1921 at promisor's hotel, the home of herself and plaintiff; of Pete Urioste, who apparently succeeded Naranjo in charge of the boiler and worked for Mrs. Cornetto from 1927 to time of her death; and the testimony of others as to seeing plaintiff engaged on different occasions in labor and services of the kind he testified to all tends to corroborate plaintiff's testimony of substantial compliance with the agreement claimed. Residence at promisor's home to afford companionship seems also to have been an element of consideration in the agreement. It is undisputed under plaintiff's evidence that he did spend approximately nine years at her home in purported compliance with the agreement.

It is urged by defendant that plaintiff's two years' absence in Texas shows abandonment. Plaintiff stated this was with her consent; that he visited her at least every two months and was in constant correspondence with her. That she was wounded by his absence appears from statements in two letters to him that are in evidence. But that she did not herself consider it abandonment is suggested by the fact that she took him back into her home upon his return, where he continued to reside for about four years under like conditions until she told him to leave about the time of her marriage to defendant. We are constrained to hold that proof of performance meets the requirement of substantiality as against a demurrer to the evidence. The evidence of abandonment is not so strong as that appearing in Bahney v. Gross, 135 Kan. 446, 10 P.(2d) 844, where the trial court sustained a demurrer to the evidence and its action was affirmed.

This conclusion meets the contention made by defendant that, notwithstanding proof of the contract and performance thereunder, equity will afford no relief unless the conscience of the chancellor is moved to grant enforcement to prevent a fraud on the promisee. We approved this doctrine in Candelaria v. De Lucero, supra. But if it be true that plaintiff rendered nine years services under the claimed contract and was willing further to perform but for the promisor's repudiation of the agreement, who can say nonenforcement would not operate as a fraud? This contention is, no doubt, based in some measure on the view entertained by the trial judge who said in his opinion: "I can say I have not been much impressed from the testimony of the plaintiff that he had suffered any hardship which would excite a court of equity. It seems to me from his own testimony it is apparent, looking back over the eleven years when he lived with the deceased, that

he was the beneficiary, rather than one who has suffered any inconvenience or hardship."

It may be that plaintiff, even though he never has performance of his claimed contract, is better off than he would have been in other employment or avocations. So to conclude, however, is pure speculation and should not control our views in passing upon the demurrer.

Defendant's counsel argues, citing many authorities, that plaintiff's proof fails in that it is not clear, cogent, and convincing. This rule will be of more potency when the court passes upon the credibility of plaintiff's testimony. If sufficient to make a prima facie case, and true, it must be accepted as convincing. Evidence of the contract, while simply stated, is not wanting in clearness. Most contracts of this nature are stated in the decisions in language of similar purport to that here shown.

In concluding, as we do, that plaintiff has made out a prima facie case, all we have said is to be considered in the light of our assumption that his testimony and that of his witnesses is true. The prima facie case thus made may be entirely overcome when defendant puts on his case. The trial court, without additional evidence, when it has the right to pass upon its credibility, may disbelieve material portions thereof. Even believing it, the court may conclude from the whole evidence that plaintiff has not shown himself entitled to equitable relief. The case is not now ripe for such a conclusion. The price the demurrant must pay for having his adversary's case tested on demurrer to the evidence is a heavy one. But he suffers no prejudice if he loses. He still may meet the case on the merits. Merchant's Bank v. Dunn, supra.

· The judgment of the district court must be reversed, with a direction to overrule defendant's motion to dismiss treated as a demurrer. Inasmuch as the judge who sat at the trial of this case is no longer on the bench, it seems advisable to award a new trial and it is so ordered.

HUDSPETH, C. J., and BICKLEY, BRICE, and ZINN, JJ., concur.